**NEWMAN v. COMMISSIONER OF INTERNAL REVENUE.***

No. 128.

Circuit Court of Appeals, Tenth Circuit.

April 5, 1930.

*Rehearing denied June 11, 1930.

Chas. H. Garnett, of Oklahoma City, Okl., for petitioner.

J. Louis Monarch, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Percy S. Crewe, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a proceeding to review a decision of the Board of Tax Appeals, under which a deficiency of $143,892.11 was assessed against petitioner for the year 1920.

In 1920, the petitioner and certain associates owned a one-half interest in certain producing oil and gas properties in the State of Oklahoma. The other half interest was owned by the Kingwood Oil Company, a corporation, hereinafter called the corporation.

In August, 1920, King, as president, and Wood, as secretary-treasurer, of the corporation, entered into negotiations with the petitioner for the purchase by the corporation of the one-half interest owned by the petitioner and his associates. When negotiations reached the point where it was determined that the purchase price would be paid largely in stock of the corporation, King and Wood stated that they would not agree to the purchase unless petitioner would enter into an agreement with them that none of the three should sell his stock in the corporation without the consent of the other two. Petitioner agreed to enter into such contract if the sale were consummated.

The outstanding stock of the corporation was then approximately 1,100,000 shares, of which Wood owned approximately 219,000 shares, and King owned approximately 240,000 shares. Much of the additional stock was held by relatives and close friends of King and Wood and by employees of the corporation. This gave King and Wood practical control of the corporation. The properties were in the process of develop-

ment and King and Wood contemplated making a sale thereof at an early date, either by a sale of the assets or of a majority of the stock in the corporation. The contemplated purchase would result in an increase of the outstanding stock of the corporation by 275,000 shares. The purpose of the agreement was two-fold: First, to have a majority of the stock pooled in the event of an agreement to sell a majority of the stock of the corporation and, second, to keep a majority of the stock ownership in King and Wood and their close friends.

It was then agreed that the petitioner and his associates should transfer their one-half interest in the properties to the corporation in exchange for 275,000 shares of the capital stock of the corporation and $23,500 in cash. The transfer was made and petitioner received 252,500 shares of such stock. His associates received all the cash and the remaining 22,500 shares of stock.

Simultaneously therewith, King, Wood and the petitioner, by oral agreement, mutually agreed that, for an indefinite period of time, none of them should sell any stock of the corporation without the consent of the other two. This agreement was faithfully performed by the parties thereto.

It is a fair conclusion, from the evidence, that the petitioner could not have consummated the sale to the corporation without entering into the pooling agreement.

In 1920 and 1921, petitioner desired to sell his stock but King and Wood refused to agree to a sale of a majority of the stock of the corporation in those years because of the large amount of income tax they would have been required to pay; and they continually refused to permit petitioner to sell any of his stock until the fall of 1921, when they agreed to a sale of 50,000 shares by him.

In 1920 and 1921, efforts were made, without success, to sell the assets of the corporation.

In 1920, a large part of petitioner's income resulted from the sale of oil and gas wells. Since the principal value of such wells had been demonstrated by exploration and discovery work done by petitioner, the commissioner computed petitioner's surtax under the provisions of section 211 (b), Revenue Act of 1918 (40 Stat. 1064), pursuant to Article 13, Regulations 45, promulgated under such Act.

The petitioner made a claim for a deduction in the sum of $439.50 on account of a bad debt due to him from the Western Rope & Manufacturing Company. The commissioner disallowed this claim. The Board of Tax Appeals found that the petitioner did not prove that the debt was ascertained to be worthless in 1920.

It was stipulated, at the hearing before the Board of Tax Appeals, that stock of the corporation had a market value in 1920 of $2.00 per share.

Counsel for petitioner asserts that the pooling agreement imposed reasonable restrictions on the sale of the stock owned by the parties thereto and was valid. Counsel for the commissioner concede the validity of such agreement. Therefore, for the purposes of this case, we will assume that such agreement was valid.

I. Section 202 (b), Revenue Act of 1918 (40 Stat. 1060), in part provides:

"When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any. * * *"

Article 1563, Regulations 45, promulgated under the Revenue Act of 1918, in part provides:

"Gain or loss arising from the acquisition and subsequent disposition of property is realized when as the result of a transaction between the owner and another person the property is converted into cash or into property (a) that is essentially different from the property disposed of, and (b) that has a market value. In other words, both (a) a change in substance and not merely in form, and (b) a change into the equivalent of cash, are required to complete or close a transaction from which income may be realized. * * *"

Did petitioner receive the equivalent of cash in 1920 in exchange for his interest in such oil properties?

Counsel for the petitioner contends that the stock of the corporation, paid to him as consideration for his interest in the oil properties, was received by petitioner burdened with the restrictions of the pooling agreement; that because thereof he was unable to sell the stock in 1920, and therefore the stock was not convertible into cash and was not the equivalent of cash in that year.

Counsel asserts that it follows, from the foregoing, that petitioner did not receive, in 1920, as the result of the sale of his interest in the oil properties, taxable income under

the provisions of section 202 (b) and Article 1563, supra.

The stock of the corporation had a market value of $2.00 per share and there was nothing in the inherent character of the stock which prevented it from being converted into cash in 1920.

What the petitioner actually received was the title to stock pooled with other stock of King and Wood, none of which could be sold without the consent of all three. Had all three consented, the stock could have been sold and converted into cash in August, 1920.

Is the question to be determined by whether the stock in the pool had a market value and was salable in 1920, if the members of the pool elected to sell it, or

Is the question to be determined by whether such stock had a market value and was salable in 1920, if petitioner elected to sell it?

If the petitioner had received the stock free from the restrictions of the pooling agreement, the question would not be determined by whether he sold the stock and converted it into cash, but by whether it had a market value and was salable, had he desired to sell it. Since it is admitted that the stock had a market value and was salable, had the petitioner received the stock free from such restrictions he would have sold it if, in his judgment, a sale was to his best interest; otherwise, he would not have sold it.

However, petitioner agreed to receive the stock restricted by the pooling agreement, believing it mutually desirable that the three largest stockholders should jointly deal with their stock for their mutual interests. It is to be supposed that King, Wood and the petitioner, in carrying out such agreement would act in good faith and agree to a sale, if such sale appeared to them to be mutually beneficial; and, if not, that they would refuse to agree to a sale. It is not to be supposed that any one of them would arbitrarily and unreasonably refuse to consent to an advantageous sale. Therefore, we may assume that the stock would have been sold in 1920 had the members of the pool believed such sale to be mutually advantageous.

The situation in which petitioner would have been, had he received the stock unrestricted by the provisions of the pooling agreement and the situation in which he was as the holder of such stock restricted by the provisions of such pooling agreement, differ in only one particular. In the first instance, a sale of the stock could have been made if, in his judgment, it was desirable. In the latter instance, a sale of the stock could have been made if, in the judgment of the members of the pool, such sale was desirable. In either case, a sale could have been made by the parties in control, had they chosen to sell.

Consideration of an analogous supposititious case may be helpful. Suppose a married man in New Mexico in 1920 had exchanged community personal property for a tract of land which had a market value and was readily salable. Under the laws of New Mexico, he could not have sold such community real estate without his wife's consenting and joining in the deed. Suppose he had desired to sell such real estate in 1920, but his wife had refused to consent thereto. In his separate income tax return for 1920, could such man have avoided income tax liability for his one-half community interest in the profit derived from such transaction, on the ground that his wife had refused to consent to the sale of such real estate? We think not.

Where a person agrees to receive, as consideration for the exchange of property, either a joint interest in property which cannot be sold without the consent of all the joint owners or an individual interest in a whole in which others have individual interests and which, by agreement, cannot be sold without the consent of all the parties in interest, we are of the opinion that the test to be applied in determining whether taxable income has been derived is not whether the property has a market value and is convertible into cash by such person, but whether it has a market value and is convertible into cash by those who, under the agreement of the parties, are vested with the power of sale. In other words, where a person voluntarily exchanges his property for other property under conditions that vest the power to sell the property received jointly in him and other persons, he receives taxable income to the extent of the profit derived from the transaction, if the property received has a market value and is salable by those in whom the power of sale is vested under his voluntary agreement.

■ II. Section 211 (b), Revenue Act of 1918 (40 Stat. 1064), provides:

"In the case of a bona fide sale of mines, oil or gas wells, or any interest therein, where the principal value of the property has been demonstrated by prospecting or exploration and discovery work done by the taxpayer, the portion of the tax imposed by this section attributable to such sale shall not

exceed 20 per centum of the selling price of such property or interest."

Article 13, Regulations 45, promulgated under the Revenue Act of 1918, in part, provides:

"*Surtax on Sale of Mineral Deposits.* * * * To determine the application of this provision to a particular case, the taxpayer should first compute the surtax in the ordinary way upon his net income, including his net income from any such sale. The proportion of the surtax indicated by the ratio which the taxpayer's net income from the sale of the property, or his interest therein computed as prescribed in article 715, bears to his total net income is the portion of the surtax attributable to such sale, and if it exceeds 20 per cent of the selling price of the property or interest such portion of the surtax shall be reduced to that amount."

The surtax was computed by the Commissioner in accordance with the above regulations. Counsel for the petitioner asserts that such surtax should have been ascertained by computing surtax in the ordinary way on that portion of the net income derived from sources other than the sale of the oil and gas properties, and by adding thereto 20 per cent. of the gross selling price of the oil and gas wells.

We think the ascertainment of the surtax attributable to the income derived from the sale of the oil and gas properties by the proportion method prescribed in Art. 13 is fair and carries out the intention of Congress. It has received judicial approval. Fowler v. United States (D. C.) 11 F.(2d) 895; Id. (C. C. A. 5) 16 F.(2d) 225. Since the promulgation of Article 13, supra, Congress has re-enacted section 211 (b), supra, in section 211 (b), Revenue Acts of 1921 (42 Stat. 237), 1924 and 1926 (26 USCA § 952 note), and section 102 (a), Revenue Act of 1928 (26 USCA § 2102), and has thereby given its approval to such departmental construction. United States v. G. Falk & Bro., 204 U. S. 143, 27 S. Ct. 191, 51 L. Ed. 411; United States v. Cerecedo Hermanos y Compania, 209 U. S. 337, 28 S. Ct. 532, 52 L. Ed. 821; National Lead Co. v. United States, 252 U. S. 140, 40 S. Ct. 237, 64 L. Ed. 496.

We hold that the surtax was properly computed.

III. We have examined the evidence and agree with the Board of Tax Appeals that the petitioner failed to establish that the debt of the Western Rope & Manufacturing Company was ascertained to be worthless in 1920.

The decision of the Board of Tax Appeals is affirmed.

COTTERAL, Circuit Judge, dissents from the first subdivision of the opinion.