## STANDARD SLAG CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5479.

Court of Appeals of the District of Columbia.
Argued Jan. 3, 1933.
Decided Feb. 6, 1933.

Blaine Mallan and John T. Kennedy, both of Washington, D. C., for appellant.

C. M. Charest, Frank M. Thompson, G. A. Youngquist, Sewall Key, and J. P. Jackson, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

MARTIN, Chief Justice.

This appeal relates to an alleged deficiency in appellant's income tax return for the year 1921. It is taken from a decision of the Board of Tax Appeals reported in 20 B. T. A. 503.

The facts are undisputed. The taxpayer is a corporation engaged in the business of buying slag produced as a by-product by iron and steel mills, and reselling it after crushing and preparing it for various uses. Formerly such slag had no commercial value, but by means of new methods of preparation it has become useful as road material, railroad ballast, and for other purposes.

On April 30, 1921, the taxpayer entered into a written contract with the Republic Iron & Steel Company of Youngstown, Ohio, for handling that company's entire output of granulated slag. The essential provisions of the contract read as follows:

"Commencing not later than May 10th, we will assume responsibility for disposal of your entire output of granulated slag, you to pay us 50¢ per net ton, weight to be determined in same manner as is done when wasted to the railroads."

"It is understood that you are not to be asked to make any capital expenditures but can turn the material out the same as you are now doing. We are also to continue to pay the $3.00 per car for any No. 1 granulated slag ordered which will reimburse you for any unusual expense in loading this material at the pits.

"It is further understood that the price of 50¢ per net ton is not fixed as a permanent price for the season or for any stated time. It is understood between us that we do not know what results can be accomplished under this new plan, and it is possible that we can market more of this material than we are estimating at this time. This will depend largely on the number of blast furnaces in operation during the next six months. At any rate the agreement is that the matter can be reviewed at any time you desire to see if a lower rate can be established. The intention is that the benefits from the arrangement will be divided fairly between the two companies.

"At the same time we are accomplishing these results we will be developing the permanent wasting dumps and will be in shape next winter to take the output for wastage in case you are not accumulating hard slag by that time. Also, the dump will be ready to receive any other waste materials which you may have.

"It is understood that any surplus remaining over and above the expenses of handling this slag during the summer months will not be considered as profit, but will be used in making preparation to waste the material during the winter season and in research and experimental efforts toward finding a permanent market for the material."

In the year 1921 the taxpayer received from the steel company its output of granulated slag, for which it was paid 50 cents per net ton, as provided by the contract. The taxpayer in that year realized net proceeds from the transaction in the sum of $90,471.65. No part of this sum was distributed by the taxpayer as dividends, but the entire amount was expended by it during the five or six years following "in research and experimental efforts toward finding a permanent market for the material," as stipulated in the contract.

The taxpayer did not include the amount thus received by it as gross income in its tax return for 1921, claiming that the payment was not received for its separate use, benefit, or disposal, and therefore resulted in only a nonprofit transaction; and that receipts when advanced for expenditures required to be made under the contract are not taxable income.

However, the Commissioner of Internal Revenue included this amount in his computation of gross income of the taxpayer for that year, and determined a deficiency accordingly. The Board of Tax Appeals affirmed the commissioner's determination, holding that the proceeds from the transaction constituted taxable income to the taxpayer. That decision is here for review.

Section 213, Revenue Act of 1921, c. 136, 42 Stat. 227, 237, reads in part as follows:

"Sec. 213. That for the purposes of this title (except as otherwise provided in section 233) the term 'gross income'—

"(a) Includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"

In our opinion, the net proceeds realized by the taxpayer in 1921 from its operations under the contract were taxable as gains, profits, or income derived under the contract. The amount thereof was actually received by the taxpayer and was thereafter expended by it in accordance with the terms of the contract. It is true that the general character of these expenditures was stipulated by the contract, but they were for the mutual benefit of both parties. The transaction was designed to advance the commercial interests and profits of both parties. The taxpayer no less than the steel company was interested in finding a larger and more profitable market for the product in order that its business would be increased and the yield therefrom augmented. The transaction was not gratuitously intended for the benefit of the public but was designed to promote the business of the parties for their common advantage. It is difficult therefore to see how the funds paid to the taxpayer under the contract can be considered otherwise than as "gain derived from capital, from labor, or from both combined." Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 193, 64 L. Ed. 521, 9 A. L. R. 1570.

The courts have uniformly held that income is none the less such in the year of its receipt because subject to limitations upon its use and disposal. In Cleveland Ry. Co. v. Commissioner (C. C. A.) 36 F.(2d) 347,

822

a street railway company operated under a franchise which provided that its stockholders should receive dividends at 6 per cent. and no more, and providing that all net earnings over and above 6 per cent. should be placed in an "interest fund" which when it reached a certain figure would automatically inure to the benefit of car riders and operate to reduce passenger fares. It was contended that the restrictions placed upon the use of this excess prevented it from being taxable income, but the court held that in spite of the restrictions the entire income was taxable. It was said by the court that earnings become "income" for tax purposes when they are received and not when they may be distributed.

Cf. Lucas v. Earl, 281 U. S. 111, 50 S. Ct. 241, 74 L. Ed. 731; Moran v. Lucas, 59 App. D. C. 142, 36 F.(2d) 546; Lonsdale v. Commissioner (C. C. A.) 32 F.(2d) 537; Newman v. Commissioner (C. C. A.) 40 F.(2d) 225; Hamilton v. Kentucky & I. Terminal Co. (C. C. A.) 289 F. 20; Houston B. & T. Ry. Co. v. United States (C. C. A.) 250 F. 1; C. W. Ray, 19 B. T. A. 1154, affirmed C. C. A. 7th, without opinion, 1931, 57 F. (2d) 1083.

It may be added that the recital in the contract that "any surplus remaining over and above the expenses of handling this slag during the summer months will not be considered as profit" is immaterial so far as the present question is concerned. It was not within the power of the parties to render the income nontaxable. Merchants' Loan & Trust Co., Trustee, v. Smietanka, 255 U. S. 509, 41 S. Ct. 386, 65 L. Ed. 751, 15 A. L. R. 1305.

The decision of the Board of Tax Appeals is affirmed.