### G & K MFG. CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 3810.

Circuit Court of Appeals, Fourth Circuit.

April 2, 1935.

Llewellyn A. Luce, of Washington, D. C. (Claude I. Parker, of Los Angeles, Cal., on the brief), for petitioner.

J. Louis Monarch, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER and SOPER, Circuit Judges, and McCLINTIC, District Judge.

SOPER, Circuit Judge.

The G & K Manufacturing Company seeks a review of a determination of a deficiency of $19,805.16 in its income tax for the year 1929, which the Commissioner of Internal Revenue based upon a profit involved in a transaction whereby the taxpayer sold and transferred its business and assets to the Kraft-Phenix Cheese Corporation, in consideration of $200,000 in cash and 17,250 shares of the common stock of the latter corporation. The transaction was covered by an agreement of August 23, 1929, as modified by a supplemental agreement of November 12, 1929, whereby the taxpayer agreed to sell the business conducted by it and all the assets thereof, tangible and intangible, subject to certain liabilities as shown on an attached statement, excluding, however, the shares of the capital stock in the Pickle Products Company and the Gelfand Manufacturing Company of California, subsidiary corporations of the taxpayer, and the assets thereof, certain lots of ground not used in connection with the business, and other minor items belonging to the taxpayer. The taxpayer agreed that for 10 years it would not engage in a business competitive to that sold, or make any sale of its products in any portion of the United States, other than California, Washington, Oregon, Idaho, Utah, Nevada, Arizona, and Montana.

The purchase price fixed by the original agreement was $1,115,492.76, of which $600,000 was to be paid in cash and the balance in the common stock of the purchaser. By the second or supplemental agreement of November 12, 1929, the parties changed the method of payment of the purchase price, and fixed it at the sum of $200,000 in cash, and 17,250 shares of the common stock of the purchaser; and the taxpayer agreed that it would not sell or assign the stock prior to February 12, 1930, without the written consent of a subsidiary corporation, wholly owned by the purchaser. It was also agreed that if, during that period, or within 90 days thereafter, the holders of a majority of the common stock of the purchaser should deposit it pursuant to a plan of reorganization, merger, or consolidation, the taxpayer would also in like manner deposit its holdings of the common stock of the purchaser.

On November 12, 1929, the agreements were carried into effect. The assets of the taxpayer were conveyed to the purchaser, and the purchase price was paid and transferred to the taxpayer. The restriction upon the transfer of the stock was noted on the stock certificates received by the taxpayer, and in accordance therewith the taxpayer neither sold nor transferred any of the stock during the year 1929. On November 12, 1929, the common stock of the purchaser ranged in price from $28 to $32⅞ per share, or an average of $30.4375. Between November 12 and November 30, 1929, it ranged from $31 to $38.50 per share, and in February, 1930, when the restriction expired, the price ranged from $43 to $49¼ per share.

On May 12, 1930, the shareholders of the Kraft-Phenix Cheese Company, the purchaser, ratified an agreement by which it was merged with and sold to the National Dairy Products Corporation, in accordance with an agreement made on March 17, 1930, and amended on April 17, 1930, whereby the preferred stock of the Kraft-Phenix Cheese Company was retired and each share of its common stock (including common stock owned by the taxpayer) was exchanged for $25 par value of 5¼ per cent. gold debentures due in 1948, and one-half of a share of the common stock of the National Dairy Products Corporation. The lowest combined price for these securities between March 1 and August 1, 1930, was equivalent to $46.50 per share of the common stock of the Kraft-Phenix Cheese Corporation.

The taxpayer remained in existence after the transfer, and, so far as the record shows, remained in business. It reported a profit on the sale of its business and assets, treating the stock of the Kraft-Phenix Cheese Corporation as having a fair market value of $20 per share. The Commissioner determined an additional profit by valuing the stock of $30.4375 per share, the average market price on November 12, 1929, when the taxpayer received it. The taxpayer filed a petition for review, describing the transfer as a sale, and making the sole contention that the Commissioner erred in increasing the value of the stock. Subsequently, it filed an amended petition making the additional contention that it was error to include as income any part of the value of the 17,250 shares of stock; and, finally, in a second amended petition, the taxpayer challenged the Commissioner's determination upon the following grounds, namely: (1) That the transaction with the Kraft-Phenix Cheese Corporation was a reorganization within the meaning of paragraph A of section 112 (i) (1) of the Revenue Act of 1928, 45 Stat. 791, 816, 26 USCA § 2112 (i) (1) (A); and (2) that the stock of the Kraft-Phenix Cheese Corporation, by reason of the restriction upon its transfer, had no fair market value when received. These two contentions are renewed in this court, with the addition that, in any event, the fair market value of the stock when received was not more than one-tenth of the list price on the New York Stock Exchange of the same stock unrestricted as to transfer.

We agree with the Board of Tax Appeals that these contentions cannot be sustained. In considering the first point, it must be borne in mind that, under section 112 (a) of the Revenue Act of 1928 (26 USCA § 2112 (a), the general rule is that gains upon the sale or exchange of property must be recognized, except as thereafter provided in the section. The exception upon which the taxpayer relies is found in section 112 (b) (4) and section 112 (d), 26 USCA § 2112 (b) (4), (d), which, amongst other things, provide in substance that, if a corporation, a party to a reorganization, exchanges property in pursuance of a plan of reorganization, for property consisting not only of stock or securities in another corporation, a party to the reorganization, but also of other property or money, then, if the corporation receiving the property or money does not distribute it in pursuance of the plan of reorganization, the gain, if any, to such corporation, shall be recognized in an amount not in excess of the sum of mon-

ey and the fair market value of the property so received. Reorganization is defined in section 112 (i) (1) (A) to mean "a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)."

■ The taxpayer argues that, in the course of the transaction now under consideration, it transferred substantially all of its property, and, by retaining the stock received in the sale or exchange, it preserved a continuity of interest in the business conducted by the taxpayer before the sale and by the purchaser thereafter. Hence it says that the transaction may fairly be regarded as a reorganization within the liberal interpretation of that term prescribed by the decided cases. See Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U. S. 462, 53 S. Ct. 257, 77 L. Ed. 428; C. H. Mead Coal Co. v. Commissioner (C. C. A.) 72 F.(2d) 22; Cortland Specialty Co. v. Commissioner (C. C. A.) 60 F.(2d) 937; Prairie Oil & Gas Co. v. Motter (C. C. A.) 66 F.(2d) 309; Lonsdale v. Commissioner (C. C. A.) 32 F.(2d) 537. See, also, John A. Nelson v. Commissioner (C. C. A. 7) 75 F.(2d) 696, February 23, 1935; Gregory v. Helvering, 293 U. S. 465, 55 S. Ct. 266, 79 L. Ed. ——. These cases do decide that the terms "merger" and "consolidation" in section 112 (i) (1) (A) are not to be construed with technical precision, for they are modified by the words in parenthesis. Thus the Supreme Court, said in Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U. S. 462, 469, 470, 53 S. Ct. 257, 260, 77 L. Ed. 428:

"The words within the parenthesis may not be disregarded. They expand the meaning of 'merger' or 'consolidation' so as to include some things which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words—so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation."

So it may be, as held by this court in C. H. Mead Coal Co. v. Commissioner, supra, that a merger of corporations, which ordinarily contemplates the extinction of one of the participants, or a consolidation which usually contemplates the extinction of the several corporations which combine, will take place in the sense of the statute without the technical dissolution of the corporation or corporations ceasing to operate. Nevertheless, not every sale or exchange of corporate assets wherein stock of the purchaser is received as payment and retained by the buyer amounts to a reorganization. The words in parenthesis modify the terms "merger" and "consolidation," but do not destroy them. The underlying purpose of the statute was to exempt purely paper profits from taxation, and to this end an attempt was made to define or describe transactions in which there is an adjustment of corporate structures without actual realization of profit. The precise limitations cannot be easily defined, but the transaction must at least partake of the nature of a "merger" or "consolidation." In our opinion, that cannot be said of the transfer under consideration. It was in effect a sale of the assets and business of the taxpayer used in the manufacture and sale of food products; but not only did the taxpayer continue to exist, but its subsidiaries seemingly continued to engage in business, and the stock thereof was expressly excepted from the sale. The extent of these holdings is not shown in the evidence; but it is clearly indicated that the subsidiaries had some assets and some active business, for it was represented in the contract of sale that no assets of the subsidiaries were included in the list of assets transferred, and covenants were exacted whereby both the taxpayer itself and a subsidiary of the same name, incorporated in California, were required to refrain from any business competitive with the business sold, except in eight named states in the western part of the United States. There is no evidence in the record to show that the taxpayer and its subsidiaries did not continue actively in business after the sale took place in 1929. Hence the taxpayer did not show with certainty that all, or even substantially all, of its assets were transferred; and, even if such a transfer did take place, the taxpayer remained in existence, possessed of a substantial amount of money, qualified to engage in active business in its own capacity or through its subsidiaries, and with the intent so to do, so far as the record shows. We are therefore unable to conclude that a reorganization within the meaning of the statute had taken place.

■ Since any gain involved in the transfer must be recognized for purposes of taxation, it becomes necessary to consider the taxpayer's second contention that the stock received either had no fair market value at all,

by reason of the restriction against alienation for three months, or none in excess of one-tenth of the list price on the New York Stock Exchange. Two witnesses for the taxpayer at the hearing before the Board, experienced in the business of buying and selling securities of the sort under consideration, testified that the restricted stock had no fair market value during the months of November and December, 1929, and could not have been sold for more than one-tenth of the list value, or approximately $4 a share. This testimony was uncontradicted, and no other evidence on the point was introduced other than the stipulation of the parties as to the average price on November 12, 1929, and the price range thereafter as hereinbefore set out. The taxpayer contends that the Board erred in disregarding this testimony and in valuing the stock at the same price as stock free from any restriction upon its transfer. It may be conceded that ordinarily a restriction upon the transfer of stock would constitute evidence that its market value had been lessened, which the Board could not fairly ignore. But, in the pending case, the nature and purpose of the restriction were shown by other evidence from which the Board concluded that the rule to be applied was enunciated in such cases as Wright v. Commissioner (C. C. A.) 50 F.(2d) 727, and Newman v. Commissioner (C. C. A.) 40 F.(2d) 225; that is to say, that a voluntary agreement to abstain from the sale or transfer of property received in a sale or exchange need not be considered in determining the market value of the property received; nor may a taxpayer postpone the taxation of a gain involved in the acquisition of property by agreeing not to sell for a certain period that which he has received.

The evidence in the pending case justifies the inference that the restriction was voluntarily imposed by the parties in order to maintain the market price for their mutual advantage; and that, in fact, it had this result. The supplemental agreement of November 12, 1929, contained an express stipulation that the taxpayer would not sell the stock for 90 days without the consent of the buyer, and during that period, or within 90 days thereafter, would join in a subsequent reorganization with the holders of the stock. Within the additional period of 90 days, namely, on May 12, 1930, the Kraft-Phenix Cheese Corporation was merged with, and sold at advantageous prices to, the National Dairy Products Company, in accordance with the agreement reached on March 17,

1930, and amended on April 17, 1930. Thus it is shown that the very purpose of the restricted agreement to benefit the parties was actually carried into effect.

Finding no error in the decision of the Board, it is affirmed.