Washington Package Store, Inc. v. Commissioner.
Washington Package Store, Inc. v. Commissioner
Docket No. 93915.
United States Tax Court
T.C. Memo 1964-294; 1964 Tax Ct. Memo LEXIS 44; 23 T.C.M. (CCH) 1805; T.C.M. (RIA) 64294; November 12, 1964
*44 1. Held, on the facts, that no part of the consideration paid by petitioner as the purchase price for the going business of a retail liquor store, is properly allocable to the leasehold occupied by such business; and that petitioner is not entitled to an amortization deduction in respect of a claimed cost for said leasehold. 2. Held, that petitioner did not realize any taxable income as a result of a transaction whereby it relinquished its rights under a covenant not to compete executed by the seller of the liquor store, and said seller cancelled certain notes payable issued by petitioner in connection with the purchase of the store. Morris Kosut, for the petitioner. Rudolph J. Korbel, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined a deficiency *45 in the petitioner corporation's income taxes for its fiscal year ended September 30, 1955, in the amount of $1,965.05. The issues for decision are: (1) Whether petitioner actually paid the sum of $34,500 to acquire a leasehold of land whereon was situated a liquor store business which it purchased, so as to be entitled to amortize and deduct such claimed leasehold cost over the life of the lease. (2) Whether petitioner realized taxable income in the year 1955 as the result of relinquishing its rights under a covenant not to compete which had been executed by the individual from whom it purchased said liquor store business, in exchange for that individual's cancelling certain notes payable given by petitioner in connection with the purchase of the store. General Findings of Fact Some of the facts were stipulated. The stipulation of facts and all exhibits identified therein are incorporated herein by reference. Washington Package Store, Inc. (hereinafter called "petitioner") is a New York corporation which during the taxable year involved conducted a business of selling alcoholic beverages at retail, for consumption off its premises (a so-called "package liquor store"), *46 at 1514 Washington Avenue, in the Borough of the Bronx, in New York City. Petitioner kept its books of account on the basis of a fiscal year ending September 30 and in accordance with an accrual method of accounting. It filed a Federal corporation income tax return for the fiscal year ended September 30, 1955, which is here involved, with the district director of internal revenue, Upper Manhattan district, in New York City. Issue 1 - Deduction for Amortization of Alleged Cost of Leasehold Findings of Fact An individual named Samuel Goldman had, for 18 years prior to 1951, been engaged in the operation of a package liquor store on Third Avenue in New York City. In that year he sold the Third Avenue liquor store to persons not here involved. In the latter part of the following year, 1952, he learned that an individual named Clarence Jenkins, the sole proprietor of a package liquor store located at 1514 Washington Avenue in New York City, was desirous of selling his business; and negotiations thereupon ensued between Goldman and Jenkins regarding the purchase by the former of the latter's business. The premises at 1514 Washington Avenue were under lease to Jenkins, at a rental *47 of $60 per month; and the remaining unexpired term of the lease was approximately 2 years and 8 months. Goldman told Jenkins that he was not interested in buying the business unless he could be assured of a 10-year lease on the Washington Avenue premises. The foregoing negotiations took place during the months of August and September 1952; and the upshot was a decision by Goldman that Jenkins' business would be purchased. Goldman and another individual named Joseph Schwartz thereupon formed a corporation, the petitioner in the instant case, which was to make the purchase and operate the business. Goldman and Schwartz each became a 50 percent stockholder of the petitioner; and Schwartz became president and Goldman became secretary-treasurer. Shortly thereafter, on October 9, 1952, Jenkins entered into an agreement with petitioner for the sale to the latter of the business then being operated by Jenkins. Said agreement provided that the "retail liquor store and business" being sold, was to include: [Goodwill], leasehold, trade names and trademarks, chattels, furniture, fixtures, equipment, and signs * * * and inventory of alcoholic beverages on hand at the time of closing * * *48 *. The agreed aggregate purchase price was to be $47,500, plus an amount equal to the cost of the seller's inventory on hand at the time of the closing. Said amount of $47,500 was to be paid in cash; and the additional amount for the inventory was to be paid by a series of 36 promissory notes, each representing 1/36ths of the total price to be thereafter determined for the inventory. As regards the lease situation at the Washington Avenue store premises, the sale agreement provided as follows: 5. Seller represents and warrants that he now occupies the premises under a lease dated May 25, 1948, with JAMES WEBB * * * as landlord, for a term of seven years ending May 31, 1955, at a monthly rental of $60., which lease is assignable with the consent of the landlord in writing. * * * Seller agrees that he will do the following: (a) Obtain the written consent of the landlord to the assignment of the existing lease to Buyer; and (b) Obtain an additional lease from the landlord to the Buyer for period of five years from June 1, 1955, to May 31, 1960, at a rental not in excess of the present rental of $60. per month plus 15 per cent. In lieu of the foregoing, the Seller, at his election, *49 may negotiate for and obtain a new lease running to the Buyer for a term which runs from the date of closing to May 31, 1960, provided the rent to May 31, 1955, does not exceed $60. per month, and the rent from June 1, 1955, to May 31, 1960, does not exceed $60. plus 15 per cent per month. Failure of the Seller to deliver the aforesaid assignment with landlord's written consent and new lease, or either of them, at or before the closing shall give Buyer the right to cancel this agreement and require the return of all money deposited hereunder without diminution. In paragraph 13 of the sale agreement, the following provisions are set forth: 13. The purchase price of $47,500. is made up as follows: Leasehold Good Will Fixtures and Equipment Following the execution of the foregoing agreement, Goldman continued to urge Jenkins to obtain a 10-year lease from the landlord, rather than for the shorter term of 7 years and 8 months mentioned in the agreement. As a result, a meeting was arranged prior to the closing date between Goldman, Jenkins, Jenkins' attorney, and the landlord's attorney, at which petitioner obtained a 10-year lease to commerce December 1, 1952, at a monthly *50 rental of $90. No amount was paid by the petitioner to the landlord at this or any other time, as premium or bouns for entering into said lease. The closing date of the sale of the entire business was December 1, 1952, shortly after petitioner's application to the New York State Liquor Authority for a license to operate a package liquor store at 1514 Washington Avenue had been approved. At Goldman's direction, the purchase price was allocated in the closing statement as follows: Leasehold
$35,000.00
Goodwill
5,000.00
Fixtures & Equipment
7,500.00
Inventory of alcoholic beverages
12,383.24
New York City Sales Tax
225.00
$60,108.24
Less: Adjustments to buyer
276.90
Net Purchase Price
$59,831.34
Petitioner issued 36 promissory notes to Jenkins for the $12,383.24 of inventory, as required by the sale agreement; and it paid him the balance in cash. Petitioner began operation of the retail package liquor store at 1514 Washington Avenue on December 1, 1952; and it has continued to operate said store to the present time. In November 1957, it entered into a new lease (which superseded that of December 1, 1952) covering the premises at 1514 Washington Avenue, *51 with the same landlord, for a 10-year period (December 1, 1957-November 30, 1967) at the same rent of $90 per month. The dimensions of the store in which petitioner conducted its business were approximately 12 feet wide by 40 feet deep; and the store was situated approximately 12 to 15 feet from the corner of Washington Avenue and 171st Street. There were two properties directly across from petitioner on Washington Avenue, each of which was of just about the same size as that occupied by petitioner. One of these was occupied by a television business, at a rental of $55 per month; while the other was vacant and was offered for rent at approximately $38 per month. The general area around 171st Street and Washington Avenue was rather poor and run down; and it contained a large number of tenement-type buildings. There were numerous vacant stores in the area. Its population in 1952 was an ethnic mixture of Jewish people, Italians, Negroes, and Puerto Ricans, with the Jewish people and the Italians gradually moving out and being supplanted by Negroes and Puerto Ricans. Petitioner, like other retail liquor stores in New York City, was subject to regulation by the New York State Liquor *52 Authority. If petitioner had desired to move its location to another point within the area which it was licensed to serve by the State Liquor Authority, it would not have had significant difficulty in securing the Liquor Authority's approval for such a move; but it would have been necessary for petitioner to hire an attorney to file an application for such approval. Some operators of retail liquor stores in New York City were paying rent for leased premises, based on a percentage of their annual gross sales. In the case of some stores in certain neighborhoods, the rents were as much as 3 1/2 to 4 percent of gross sales. Petitioner's fixed annual rent of $1,080 was approximately 1 percent of the annual gross sales of the Washington Avenue store at the time petitioner purchased it from Jenkins. At the time petitioner purchased Jenkins' business, the prevailing method for fixing the purchase price of such businesses in the New York City area was to have the purchaser pay between 40 and 45 percent of the annual gross sales for the going business, plus dollar-for-dollar for the cost of the seller's inventory of alcoholic beverages. In its return for its fiscal year ended September 30, 1955, petitioner *53 attributed a cost of $34,550 [1] to the leasehold; and it claimed an amortization deduction in respect thereto in the amount of $3,454.92. Respondent, in his statutory notice of deficiency, disallowed this claim deduction in its entirety; and he explained his action as follows: (a) It has been determined that an amount of $34,550.00 shown on the return as the cost of acquisition of a leasehold actually constituted the purchase of good will. Consequently, a deduction in the amount of $3,454.92 claimed for amortization of the leasehold is not allowable under the Internal Revenue Code of 1954. Ultimate Finding of Fact The fair rental value of the store premises at 1514 Washington Avenue, which were occupied by the petitioner, was not more than the $90 per month rental at any time from December 1, 1952, throughout the taxable year involved. Petitioner did not pay any premium or bonus to acquire the leasehold on said premises. Opinion *54 Where a taxpayer pays a premium or a bonus to acquire a leasehold of property, the judicial authorities and the Treasury regulations permit the taxpayer to take an amortization deduction for an aliquot portion of such premium or bonus for each year over the life of the lease. Oscar L. Thomas, 31 T.C. 1009; William C. Newman, 10 B.T.A. 158, affirmed without discussion of this issue (C.A. 10) 40 F. 2d 225, certiorari denied 282 U.S. 858; Grosvenor Atterbury, 1 B.T.A. 169; Cooper Foundation v. O'Malley, (C.A. 8) 221 F. 2d 279. The Treasury regulations ( Income Tax Regs., sec. 1.162-11(a)) state the rule thusly: (a) Acquisition of a leasehold. If a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run. * * * The leasehold is regarded as an intangible asset that is gradually being exhausted by the passage of time; and the cost of acquiring it is to be recovered by way of the aforesaid amortization deductions ratably over the *55 period of exhaustion, in the same manner as the costs of fixed tangible assets are recovered by way of depreciation deductions. Such amortization deductions are, of course, in addition to those for rent require to be paid under the lease. It is clear, under the foregoing authorities, that the taxpayer must have incurred some cost, by an outlay of money or other consideration, as a necessary prerequisite to the allowance of the deductions. Bearing the foregoing in mind, we turn to the facts of the instant case. Petitioner acquired a leasehold; but the question remains, did it give any consideration in the nature of a premium or bonus to acquire said leasehold? Or, was the only outlay of funds which it was required to make as consideration for the use and occupancy of the leased premises, the $90 monthly rental paid to the landlord, deductions for which have been allowed? Petitioner did not pay the landlord James Webb any premium or bonus to acquire the leasehold; nor does it claim to have done so. Rather, petitioner claims that, out of the $47,500 which it paid to Jenkins for the liquor store (exclusive of the inventory), $34,550 was to be allocated as the cost of the 10-year lease *56 which it negotiated with the landlord prior to the settlement. In the statement drawn up for the closing of the sale of the store on December 1, 1952, the slightly greater amount of $35,000 is shown as the portion of the total purchase price allocated to the leasehold; but this was done at the instruction of Goldman, petitioner's secretary-treasurer, and his unilateral action is not binding either upon the Commissioner or upon this Court. Copperhead Coal Co. v. Commissioner, (C.A. 6) 272 F. 2d 45, 48, affirming a Memorandum Opinion of this Court. We think that petitioner's contention is without merit. Actually, petitioner did not acquire the 10-year leasehold from Jenkins. The facts show that petitioner went into possession under the 10-year lease in its own name, acquired from the landlord following a joint conference between Goldman, Jenkins, Jenkins' attorney, and the attorney for the landlord. Moreover, the record establishes, and we have found as an ultimate fact, that the fair rental value of the premises was no more than the $90 monthly rental that was called for by the lease, which is to say that that was all the premises were worth and that there was no necessity *57 to pay any premium to acquire the leasehold. In addition, there were other vacant store properties in the area, including one of approximately the same size as petitioner's store just across the street, to which petitioner could have moved if the landlord had insisted on a premium or bonus or a higher rental for the premises. Petitioner argues that, because some other liquor stores in certain areas of New York City were paying 3 1/2 to 4 percent of annual gross sales as rent whereas it was paying only about 1 percent of its annual gross sales, it was achieving a saving that, over a 10-year period, could aggregate $35,000, the same amount which its officer Goldman allocated as the cost of the leasehold. But the mere fact that a lease may have been advantageous to the lessee does not warrant the allowance of any amortization with respect thereto, unless a bonus or premium was actually paid to acquire the same. And we have hereinbefore found that that was not done in the present case. After considering and weighing the evidence, we conclude that the $47,000 paid by petitioner for the liquor *58 store business (exclusive of the inventory) was paid for the acquisition of the bundle of rights, privileges and assets of the going business, including a covenant not to compete (which is discussed in Issue 2). Petitioner has not established that $35,000 of that sum (or any other amount) was paid to acquire the leasehold on the business premises. We decide this first issue for the respondent. Issue 2 - Alleged Income from Cancellation of Indebtedness Findings of Fact During the course of Goldman's preliminary negotiations with Jenkins for the purchase of the latter's liquor store, Goldman learned that Jenkins was a former professional basketball player, who had a substantial number of friends and followers in the neighborhood. Goldman was apprehensive that if the purchase transaction went through, Jenkins might thereafter decide to return to the locality and to reenter the liquor store business; and that if this happened it might hurt the business that Goldman would be operating. To avoid this possibility, Goldman insisted that Jenkins enter into a covenant not to compete; and Jenkins acceded to Goldman's demands. Accordingly, when the above-mentioned sale agreement was entered *59 into between petitioner and Jenkins, the following provision was included therein: 9. Seller shall also execute at the closing an agreement that for a period of five years from the closing neither he nor any member of his immediate family will engage, directly or indirectly, or as an employee, in a retail liquor store business within a radius of five miles from 1514 Washington Avenue, Bronx, New York City. Thereafter, at the closing of the transaction on December 1, 1952, Jenkins did execute an appropriate covenant not to compete for 5 years. Petitioner's officers would not have been willing to pay over $40,000 (exclusive of inventory) for Jenkins' business, if he had not given the foregoing covenant, and the portion of the total purchase price of $47,500 actually paid which is applicable to the said covenant, was not less than $5,000. Sometime during the year 1955 Goldman heard rumors that Jenkins was planning to open a liquor store within the area proscribed by the covenant not to compete which he (Jenkins) had executed in 1952. Goldman confronted Jenkins who admitted that the rumors were true. Goldman thereatened to enjoin Jenkins. After negotiations, Jenkins was allowed *60 to reenter the liquor business in the vicinity of petitioner's store, and in return Jenkins agreed to cancel the remaining notes payable which had been issued to him at the time of petitioner's purchase of the business. The total amount of said remaining notes payable was $3,095.26. Petitioner released Jenkins from liability under the provisions of the covenant not to compete; and Jenkins released petitioner from liability on the remaining unpaid notes payable. Jenkins' gross sales for the year 1951 were $101,303.87 and for the first 9 months of 1952 were $70,100.48. Petitioner's sales for the calendar year 1952 were between $120,000 and $130,000; and its sales for its fiscal year ended September 30, 1955, were $133,890.21. Thus petitioner's sales exceeded those of the store when it was operated by Jenkins. Petitioner, on its income tax return for its fiscal year ended September 30, 1955, did not report as income any amount arising from the cancellation of its notes payable. Petitioner treated the cancellation of said notes, both on its books and on the balance sheet (Schedule L) attached to its income tax return for its fiscal year here involved, as a reduction of good will. *61 Respondent however, in his notice of deficiency herein, determined that the entire amount of the cancelled notes payable ($3,095.26) constituted taxable income to petitioner in its fiscal year ended September 30, 1955; and he explained his action as follows: (b) It has been determined that the taxable income shown on the return should be increased in the amount of $3,095.26 by reason of the cancellation of indebtedness, represented by notes payable due to Clarence Jenkins in that amount. Opinion Respondent's contention under this second issue, is that by having its notes payable cancelled (thereby being freed from a liability), petitioner was in effect recovering profits which it anticipated that it would lose as a result of Jenkins' reentry into the liquor business within the area proscribed by his covenant. We think that the evidence does not bear out the contention. The sum of the notes payable which petitioner received back, $3,095.26, bears no relation to any anticipated lost profits. We believe that petitioner (acting through Goldman) insisted upon Jenkins' 5-year covenant not to compete, in order to protect the going business which it was acquiring; and that petitioner *62 was required to pay Jenkins something for such covenant. Under the first issue we have held that petitioner paid $47,500 for the bundle of rights, privileges, and assets of the going business, including the covenant not to compete, and in our Findings of Fact as to this present issue, we have found that the portion of such amount applicable to said 5-year covenant was not less than $5,000. Accordingly, when the unexhausted period of approximately 3 years under the covenant was relinquished by the petitioner in the taxable year involved, petitioner was giving up the protection afforded by its rights under the covenant and receiving back a portion of the consideration it had paid for such protective right. This transaction did not result in any gain to the petitioner. We decide this second issue for the petitioner. Decision will be entered under Rule 50. Footnotes
1. The difference between the $34,550 figure claimed on the return and the $35,000 figure contained in the closing statement, is not explained in the record.↩