## FLANAGAN v. HELVERING, Com'r of Internal Revenue.

### No. 7448.

United States Court of Appeals for the District of Columbia.

Decided Oct. 14, 1940.

John F. Greaney and Frank J. Albus, both of Washington, D. C., for petitioner.

Sewall Key, Sp. Asst. to Atty. Gen., Norman D. Keller and S. Dee Hanson, Department of Justice, and J. P. Wenchel,

Chief Counsel, and Irving M. Tullar, Sp. Atty., of the Bureau of Internal Revenue, all of Washington, D. C., for respondent.

Before GRONER, Chief Justice, and EDGERTON and VINSON, Associate Justices.

VINSON, Associate Justice.

The question presented by this appeal is whether the Board of Tax Appeals erred in its ultimate determination that moneys received by the McCaffrey estate, in redemption of a part of its stock in F. Archibald, Inc., was "essentially equivalent to the distribution of a taxable dividend".

From a stipulation of facts and the testimony of Michael A. Flanagan, the Board made its findings in narrative form. An excerpt of the relevant facts follows:

"Michael A. Flanagan is co-executor of the estate of John J. McCaffrey, who died, a resident of Haverhill, Massachusetts, June 8, 1931. * * *

"F. Archibald, Inc., was organized by McCaffrey and Freelon N. Archibald in 1918 and engaged in the sale of high grades of leather for shoes. Its capital stock, represented originally by 100 shares of a par value of $100 each, was closely held by Archibald and McCaffrey or members of their families. Archibald died in 1919. * * * [Since that time Flanagan, in some representative capacity, has held and voted the Archibald family's stock.] On January 15, 1920, * * * F. Archibald, Inc., increased its capital stock by $35,000, represented by 350 shares; in so doing it capitalized $15,310 of surplus and current earnings.

"On October 19, 1921, Flanagan as trustee entered into an agreement to sell McCaffrey 88 shares of F. Archibald, Inc., at $100 a share, the price being payable from dividends on McCaffrey's stock. The avowed intention of the parties was that the trustee for the Archibald interests and McCaffrey should hold an equal number of shares 'during the term of this agreement and forever after'. On February 16, 1923, Flanagan as trustee transferred the 88 shares to McCaffrey and each then held 225 shares. On December 28, 1926, Flanagan as trustee and McCaffrey each received 125 additional shares in cancellation of the corporation's indebtedness of $25,000 to both of them, and at the same time each received 300 additional shares as a stock dividend [with a par value of $60,000].

* * *

"On December 31, 1933, the corporation had an earned surplus of $70,351.49. Its net income for the year was $10,017.20, and its net sales $274,016.99. Because of a lessening demand for expensive shoes, the corporation suffered a sharp decrease from net sales of $921,875.81 in 1927, its most profitable year, but there was no indication of any great change in 1933 and it has since continued to operate for profit. For the period 1918-1933 it realized net incomes in all years but four, and during the decade ending in 1933 its earned surplus ranged from $39,372.16 to $101,683.40. It paid a cash dividend of $13,000 in 1932 and of $6,500 in 1933, but no others. * * *"

"When confronted with the necessity of raising the $18,400 cash to pay the debts and expenses and close the administration of McCaffrey's estate in 1933, Flanagan informally consulted the probate judge, and it was their consensus that he should sell some of the estate's shares to F. Archibald, Inc., rather than have the corporation declare a dividend out of its available earnings and surplus, as he could have caused it to do, because in their opinion such a dividend would belong to the heirs. Accordingly Flanagan, who was the corporation's president and represented all the shareholders as executor or trustee, had his attorney draft a resolution that the corporation 'buy back from the Estate of John J. McCaffrey all the shares of stock which it desires up to the number of one hundred and ninety. (190)' and an equal number from the Archibald heirs or their representatives. The resolution was adopted * * * [and] pursuant thereto the corporation paid $18,400 to Flanagan, Executor, and received 184 of its shares from McCaffrey's estate; it likewise paid $18,400 for 184 of its shares held by Flanagan as trustee under wills of the Archibalds. It cancelled both lots upon receipt. In his account of the estate, submitted to the Probate Court, Flanagan, Executor, treated the $18,400 as corpus; the account was approved. No income tax return was filed by the estate for 1933."

The Commissioner contends that the $18,400 stock redemption payment to the McCaffrey estate is sufficiently similar to a taxable dividend to fall within § 115(g) of the Revenue Act of 1932.[1] The tax was assessed on this basis, plus a 25% penalty for failing to file a return. The estate, through Flanagan its co-executor, argues that the payment does not come under § 115(g), but rather, that the redemption is a partial liquidation which should be treated on a capital gain or loss basis as provided by § 115(c). If so treated, it is argued further, a loss was sustained and, therefore, no tax due. The Board decided in favor of the Commissioner.

In 1933, Mr. Flanagan, as co-executor of the McCaffrey estate, found that he needed $18,400 to take care of debts and administration expenses. The stock redemption plan to raise this money was conceived because of a fear that the heirs would be entitled to a dividend issued in the usual fashion, and hence the estate would be in no better position to pay its debts. The corporation proceeded to redeem 368 shares of stock, paying $18,400 to the McCaffrey estate and a like amount to the Archibald heirs. Thus, the proportionate ownership of the corporation was not altered.

The corporation operated profitably before (as well as since) the redemption. In 1920, $15,310 of earnings were capitalized. In 1926, a stock dividend with a par value of $60,000 was declared. Of the 1300 shares outstanding before the redemption, 753.1 signified corporate profit. Meanwhile, the only cash dividends paid were $13,000 in 1932, and $6,500 in 1933. In the year of the redemption there was an earned surplus of $70,451.49, with current net income of $10,017.20.

Under these circumstances, was the redemption and cancellation of the stock "at such time and in such manner as to make the distribution essentially equivalent to the distribution of a taxable dividend"? To say that the present redemption should be treated as a dividend is in accord with, if not demanded by, the ratio decidendi in

---

[1] "If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend." 47 Stat. 204, 26 U.S.C.A. Int.Rev.Code § 115(g).

Hyman v. Helvering.[2] The illustration given in the House, Senate, and Conference Reports,[3] set out in that case, shows the applicability of § 115(g) to the instant controversy: Suppose "* * * the case of two men holding practically the entire stock of a corporation for which each paid $50,000. The corporation having accumulated a surplus of $50,000 above its cash capital, buys from the stockholders for cash one-half of the stock held by them and cancels it, and the payment is nontaxable because it is a partial redemption of stock. To change this result and make it taxable [§ 115] (g) was written and incorporated into the law".[4]

In determining whether a transaction is equivalent to a taxable dividend under § 115(g), or whether it is a partial liquidation within § 115(c), neither the Board of Tax Appeals nor the courts have laid down a sole decisive test. The phrases "in such manner" and "essentially equivalent" negative any idea that a weighted formula can resolve the one crucial issue—shall the distribution be treated as a taxable dividend.

■ Most of the judicial criteria that have been determinative in placing a transaction within § 115(g) are presented in the instant case. The major part of the capitalization represented former earnings; only two relatively small cash dividends were paid; the proportional ownership of the shareholders was not changed; the corporation did not manifest any policy of contraction; the initiative for the corporate distribution came from a stockholder who needed cash; it has continued to operate at a profit.[5] Absent here is the maintenance of the same capital liability, and there is no finding of a scheme of tax evasion (bad faith), factors sometimes significant.[6] But the net effect of the distri-

---

[2] The petitioner owned all but 2 of the 2000 shares in the Hyman Construction Company for which he had paid $199,800. The Construction Company at the time of the redemption and cancellation had an earned surplus of over $100,000. The petitioner did not want such a large capitalization and the earnings to be subject to the risks of the construction business. Hence, he delivered to the Company 1950 shares for which he received a $195,000 check. This money he turned over to the George Hyman Properties, Inc., a newly formed corporation, which used it to buy real estate, stocks, and bonds from the Construction Company. The Commissioner contended that the redemption payment to the extent of the surplus should be treated as a taxable dividend under § 115(g). The Board (28 B.T.A. 1231) and this court agreed, 63 App.D.C. 221, 71 F.2d 342, certiorari denied 293 U.S. 570, 55 S.Ct. 100, 79 L.Ed. 669.

[3] H. Rep. No. 1, 69th Cong. 1st Sess. p. 5; S. Rep. No. 52, 69th Cong. 1st Sess. p. 15; H. Conference Rep. No. 356, 69th Cong. 1st Sess p. 30. This illustration was given under the Act of 1926, § 201(g), 44 Stat. 11, 26 U.S.C.A. Int.Rev. Acts, page 147, which in the relevant portions is identical with § 115(g) of the 1932 Act.

[4] 63 App.D.C. 221, 223, 71 F.2d 342, 344.

[5] Cases in which the redemption was held to be within § 115(g): Goding v. Com'r of Internal Revenue, 34 B.T.A. 201 [capitalized earnings]; Grimditch v. Com'r of Internal Revenue, 37 B.T.A. 402 [capitalized earnings, proportionately low cash dividends]; Natwick v. Com'r of Internal Revenue, 36 B.T.A. 866 [spasmodic cash dividends, no need for contraction]; Robinson v. Com'r of Internal Revenue, 5 Cir., 69 F.2d 972 [pro-rata distribution]; McGuire v. Com'r of Internal Revenue, 32 B.T.A. 1075; Id., 7 Cir., 84 F.2d 431 [no need for contraction]; Brown v. Com'r of Internal Revenue, 3 Cir., 79 F.2d 73 [business continued at a profit].

In the following, the transaction was held not to be within § 115(g) but the respective criteria were discussed: Babson v. Com'r of Internal Revenue, 27 B.T.A. 859; Id., 7 Cir., 70 F.2d 304 [consistent cash dividends, need for contraction]; Champion v. Com'r of Internal Revenue, 27 B.T.A. 1312; Id., 6 Cir., 78 F.2d 513 [consistent large cash dividends, need for contraction]; Koch v. Com'r of Internal Revenue, 26 B.T.A. 1025 [not pro rata]; Com'r of Internal Revenue v. Ahlborn, 3 Cir., 77 F.2d 700 [see dissent, proportional ownership]; Asmussen v. Com'r of Internal Revenue, 36 B.T.A. 878 [corporate reason to change type of stock outstanding, pro-rata distribution, substantial cash dividends]; Allen v. Com'r of Internal Revenue, 41 B.T.A. 206 [need for contraction, initiative from corporation].

See I Paul and Mertens, Law of Federal Income Taxation, 1934, § 8.109; 105 A.L.R. 774, 780; 49 Harv.L.Rev. 1344 (1936).

[6] Hill v. Com'r of Internal Revenue, 27 B.T.A. 73; Id., 4 Cir., 66 F.2d 45 [no scheme but same capital liability, within

bution rather than the motives and plans of the taxpayer or his corporation, is the fundamental question in administering § 115(g).

The cases, moreover, for the most part, involve instances where the present surplus was not in excess of the distribution, although previously profits had been capitalized.[7] Here, there was an earned surplus of $70,451.49, with current net income of $10,017.20, the distribution amounted to $36,800. For a case like this, the statutory declaration of § 115(b) leaves little, if any, doubt. "For the purposes of this Act [chapter] every distribution is made out of earnings or profits to the extent thereof, * * *." The distribution, then, came out of the earnings and profits. The force of this statutory mandate must be admitted. For example, Patty v. Helvering,[8] a case in which earnings had been capitalized through stock dividends but the present surplus was negligible, laid down the extreme test of bad faith, and then added, "There is no possibility of abuse in this, for § 115(b), 26 U.S.C.A. § 115(b), controls the marshalling of earnings, and ex

proprio vigore allocates all distributions against them so long as there are any."[9] Thus the strongest case upon which petititioner relies makes an express exception for a case with facts like the present one.

■ We see, therefore, no error in the Board's determination that the redemption payment "was essentially equivalent to the distribution of a taxable dividend" and should be so treated.

■ The petitioner contends that since the McCaffrey estate is a taxpayer distinct from the decedent to whom the stock was issued, § 115(g) should not apply. As indicated by his brief, Commissioner v. Cordingley[10] intimates, and Parker v. United States[11] holds, that § 115(g) may not cover redemption payments made to an intervening purchaser for value. No such situation exists here. In view of all the other factors in the case, we do not consider the change of ownership controlling.

The decision of the Board of Tax Appeals is affirmed.

Affirmed.

§ 115(g)]; Goldstein v. Com'r of Internal Revenue, 7 Cir., 113 F.2d 363.

[7] For example, Hill v. Com'r of Internal Revenue, 27 B.T.A. 73; Id., 4 Cir., 66 F.2d 45; Com'r of Internal Revenue v. Babson, 7 Cir., 70 F.2d 304; Com'r of Internal Revenue v. Quackenbos, 2 Cir., 78 F.2d 156; Patty v. Helvering, 2 Cir., 98 F.2d 717.

[8] 2 Cir., 98 F.2d 717.

[9] 2 Cir., Ib., 98 F.2d at page 719. See Hyman v. Helvering, 63 App.D.C. 221, 71 F.2d 342, 344.

[10] 1 Cir., 78 F.2d 118.

[11] 7 Cir., 88 F.2d 907.