FOSTORIA GLASS CO. v. YOKE, Collector of Internal Revenue.

No. 88.

District Court, N. D. West Virginia.
July 31, 1942.

Austin V. Wood and Richard G. Herndon, both of Wheeling, W. Va., for plaintiff.

Joe V. Gibson, U. S. Atty., of Kingwood, W. Va., Howard Caplan, Asst. U. S. Atty., of Clarksburg, W. Va., William B. Waldo, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe, and Ruppert Bingham, Sp. Assts. to the Atty. Gen., of counsel), for defendant.

BAKER, District Judge.

This is a claim for refund of income and excess profits taxes paid by Fostoria Glass Company, plaintiff herein, to the defendant, F. Roy Yoke, Collector of Internal Revenue for the Northern District of West Virginia, for the fiscal years of 1935 and 1937. The claim grows out of certain transactions had by Fostoria during those years in the capital stock of Diamond Alkali Company, a Delaware corporation.

Diamond Alkali Company, a West Virginia corporation, was organized in 1910 for the purpose of manufacturing soda ash and other chemical products. Subscription to its stock was limited to companies manufacturing glass and soap, together with the officers thereof. Those companies subscribing to its capital stock entered into an agreement whereby they obligated themselves to buy their entire supply of soda ash from the company at certain fixed prices. They also agreed that all stock should be placed in the hands of a trustee and that if the owner thereof should desire to sell his stock, the company should have the right to purchase the same at the book value thereof at the date of the sale. There was a further provision in the agreement whereby the right of the company to so purchase might be waived with the consent of the owners of seventy per cent (70%) of the capital stock. Fostoria subscribed for two hundred fifty (250) shares of Diamond stock and deposited it in accordance with this agreement.

The company commenced operations in July of 1912 and from the start was phenomenally successful. It has paid cash dividends from the first six months of its operation to the present time. These dividends have been very substantial from the standpoint of the original investment, but very much restricted from the standpoint of the net earnings of the company. The company also between 1912 and 1928 paid very substantial dividends in common stock, which dividends were capitalized out of earnings, so that on December 31, 1928, Fostoria's original holding of two hundred fifty (250) shares of common stock had been increased through these dividends to fifteen hundred (1,500) shares.

As of December 31, 1928, Diamond Alkali reorganized as a Delaware corporation with a capitalization of eighty thousand (80,000) shares of Series A Preferred stock, eighty thousand (80,000) shares of Series B Preferred stock and one hundred twenty-five thousand (125,000) shares of Common stock. Shares in Diamond of West Virginia were exchanged for Diamond of Delaware, each share of Diamond of West Virginia receiving one and one-fourth (1¼) shares of common and one (1) share each of the Series A and Series B Preferred stock.

From the date of the organization of Diamond of Delaware to and including March of 1937, Diamond, in addition to cash dividends, paid a twenty-five per cent (25%) stock dividend in 1932, a five hundred per cent (500%) stock dividend in 1934, and a fifty per cent (50%) stock dividend in 1937. All were capitalized out of the earnings of the company.

Beginning in January of 1931, Diamond began to reacquire its Series A and Series B Preferred stock at the call price thereof and by April 1, 1937, it had reacquired and either retired or placed in its treasury all of the Preferred stock. The reacquisition of this stock was financed with current

earnings of the company and there appears no sound business reason for the retirement of the stock. The company was not engaged in a policy of retrenchment or liquidation, but on the other hand, was rapidly expanding. It was not Diamond's policy to reduce its capital stock. As the preferred stock was called for redemption, the common stock was being systematically increased so that at the termination of the whole program of reacquisition of preferred stock and issuance of common stock in the form of stock dividends, the capitalization of the company was increased.

During its fiscal year of 1935, Fostoria delivered to Diamond one thousand one hundred twenty-five (1,125) shares of its Series A Preferred stock and received therefor one hundred twenty-three thousand seven hundred fifty dollars ($123,750.-00), and in 1937 it delivered to Diamond one thousand (1,000) shares of its Series B Preferred stock and received therefor ninety-nine thousand nine hundred thirty dollars ($99,930.00).

## The Issues.

The problem involved in this case is tion of its preferred stock by Diamond es- Fostoria from these two transactions. This problem resolved itself into two issues:

First: Was the issuance and reacquisition of its preferred stock by Diamond essentially equivalent to the distribution of a taxable dividend under the provisions of Section 115(g) of the Revenue Acts respectively of the years 1934 and 1936, 26 U.S.C.A. Int.Rev.Acts, pages 704, 870?

Second: Did this transaction constitute a sale by Fostoria Glass Company of the Diamond stock in question resulting in the realization of a profit and if so, what was the March 1, 1913, value of the Diamond Alkali Company stock (West Virginia) held by Fostoria upon that date, it being agreed by the parties hereto that the March 1, 1913, value to be allocated each share of the Series A of Diamond (Delaware) is 6.0833% of the March 1, 1913, value of Diamond (West Virginia) and the value to be allocated to each share of B Preferred stock of Diamond (Delaware) is 4.9766% of the March 1, 1913, value of Diamond (West Virginia)?

The first of these issues was submitted to the Court and is now for decision.

The second issue, to-wit, the March 1, 1913, value of Diamond (West Virginia) was submitted to a jury, which found that value to be three hundred twenty dollars ($320.00) per share as contended by the plaintiff. The Government had contended this value to be one hundred eight dollars ($108.00) per share. This contention was based upon the restrictive agreement hereinbefore described and the further contention that the book value as of March 1, 1913, was one hundred eight dollars ($108.00) per share. The defendant has moved the Court to set aside the verdict of the jury, which motion is now before the Court for decision.

## Issue No. 1.

It is agreed between the parties hereto that all requirements of law pertaining to the filing of returns, the filing of claim for refunds, and other technicalities, have been complied with.

Numerous authorities have been cited by counsel for plaintiff and counsel for defendant upon the first issue of this cause. A reading of these authorities inevitably leads to the conclusion that whether or not an issuance and reacquisition of stock by a corporation is substantially equivalent to the distribution of a taxable dividend under the provision of Section 115(g) of the Revenue Act is largely a matter of fact to be determined by the Court. The statute was obviously enacted to prevent the avoidance of tax through the adoption of this manner of distribution of the earnings of the corporation. Under the earlier decisions there was a tendency to examine the intent behind the transaction. Whether or not the corporation was motivated by a legitimate business reason or was guilty of a conspiracy to enable its stockholders to avoid income taxes incident to the reception of cash dividends. Commissioner v. Cordingley, 1 Cir., 78 F.2d 118; Adler v. Commissioner, 5 Cir., 77 F.2d 733; Robinson v. Commissioner, 5 Cir., 69 F.2d 972. The more recent decisions, however, including the case of Hill v. Commissioner, 66 F.2d 45, decided in the Fourth Circuit, have veered away from this doctrine and reached the conclusion that the true "beacon" by which the Court must be guided is the result accomplished. Did the issuance and reacquisition result in a diminution of the capital structure of the company? Did the transaction result in a restriction of the company's business? Was the reacquisition of the stock a partial liquidation? Hirsch v. Commissioner, 9 Cir., 124 F.2d 24; Smith v. United States, 3 Cir., 121 F.2d 692; Flanagan v. Helver-

ing, Commissioner, 73 App.D.C. 46, 116 F. 2d 937; McGuire v. Commissioner, 7 Cir., 84 F.2d 431. Under these cases the Court in following this "beacon" may, of course, be guided by such indications as the existence or nonexistence of a sound business reason for the transaction, whether or not cash dividends during the history of the company have been fairly proportionate to its earnings, whether or not the capital stock of the company was closely held, and whether or not the company at all times was possessed of cash and negotiable securities more than adequate to meet its operating needs.

Following the "beacon" established by these cases, as well as the "guiding stars" pointing thereto, the Court can reach but one conclusion in this case. The issuance and reacquisition of its A and B Preferred stock by Diamond did not result in a diminution of the capital structure. It did not result in a restriction of the company's business. It was not a partial liquidation. There were in existence no sound business reasons for the transaction. The cash dividends paid were not commensurate with the net earnings of the company. The capital stock of the company was closely held. The company was at all times possessed of much more cash and negotiable securities than was adequate to meet its operating needs. The Court must, therefore, find that the issuance of this stock by Diamond of Delaware and its reacquisition by that company was substantially equivalent to the distribution of a taxable dividend under the provisions of Section 115(g). Being such taxable dividends, the plaintiff, under the provisions of Section 23(p) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Acts, page 674, is entitled to a dividend received credit for the sums received by it upon the redemption of eleven hundred twenty-five (1,125) shares of Series A Preferred stock during its fiscal year ending June 30, 1935, and to a dividend received credit of eighty-five per cent (85%) on the amounts received upon the redemption of one thousand (1,000) shares of Series B Preferred stock during its fiscal year ending June 30, 1937.

### Issue No. 2.

It is urged by the defendant that the Court erred in the admission of certain evidence in the trial of the second issue, to-wit, the March 1, 1913, value of Diamond (West Virginia) stock. The Court passed upon these matters during the hearing of the cause and assigned ample authority in support of its decisions.

There, therefore, remains but one question to be decided: Was the March 1, 1913, value of this stock restricted to one hundred eight dollars ($108.00) per share by the deposit agreement entered into by the stockholders? The defendant cites as his authority for the contention that this stock is so limited the cases of Helvering, Commissioner, v. Salvage, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511; Wilson v. Bowers, 2 Cir., 57 F.2d 682; Lomb v. Sugden, 2 Cir., 82 F.2d 166. The holding of the Circuit Court of Appeals in the case of Helvering v. Salvage is reported in 2 Cir., 76 F.2d 112, and it is this decision which must be studied in order to arrive at an understanding of this case. Salvage was an employee of the Viscose Company. He was permitted to purchase stock in that company at a bargain price, giving the company the right to repurchase certain portions of the stock through the next succeeding four years at one hundred dollars ($100) per share. This right of the company was absolute. It was not conditioned upon Salvage's desire to sell. Although the question directly involved in the present cause was not at issue in the Salvage case, the Court held that under these conditions the value of the stock was limited by the restrictive agreement. Both Wilson v. Bowers and Lomb v. Sugden were cases arising under the estate tax law. In each there was an absolute obligation to sell at a fixed price and in each it was held by the Court that the value of the stock was limited by the restrictive agreement.

The plaintiff has cited Behles v. Commissioner, 7 Cir., 87 F.2d 228; Newman v. Commissioner, 10 Cir., 40 F.2d 225; Heiner, Collector, v. Gwinner, 3 Cir., 114 F.2d 723; as well as several Board of Tax Appeals cases. Each of these decisions is based upon the income tax law and involves the finding of March 1, 1913, value of securities. In each the so-called restrictive agreement provided for sale at a certain price IF the owner desired to sell. There was no such absolute obligation to sell as existed in Helvering v. Salvage and Wilson v. Bowers and Lomb v. Sugden. In that fact lies the distinction between the two lines of decision. Naturally, if the holder of valuable stock is under an absolute contract to sell at a price less than the fair value thereof, it may be assumed that the sale will be consummated. The value of the security is,

966

therefore, restricted by the agreement. On the other hand, if there exists no obligation to sell, the contract merely providing for a deposit and the fixing of a price *if* the owner desires to sell, no such conclusion follows. Under the latter circumstances, the restrictive agreement may be either detrimental or beneficial to the value of the stock, depending upon the circumstances. Michigan Trust Co. v. Commissioner, 27 B. T.A. 556.

In the case of the stock of Diamond Alkali, it would seem that the restrictive agreement was of benefit to the holders of stock. Its sole purpose was to prevent the stock from falling into the hands of competitor companies which at that time held a virtual monopoly upon the production of soda ash. The agreement also eliminated all uncertainties as to the market the company would have for its product and the price to be received therefor. There was no restriction which prevented the owner of Diamond Alkali stock from selling the beneficial ownership thereof and it would appear that a prospective purchaser would be justified in paying a higher price for the stock carrying with it, the restrictive agreement, than without such restrictions. This question was clearly submitted to the jury by the Court's instruction. The jurors were told that in arriving at their verdict, they should consider the restrictive agreement and whether or not said agreement enhanced or detracted from the value of the stock. They found the value to be three hundred twenty dollars ($320.00) per share. There having been no error in the trial of the case, there seems no reason to set the verdict aside.

The amounts which the plaintiff would be entitled to recover under this issue are included in the amounts recoverable under Issue Number 1.

### Findings of Fact and Conclusions of Law upon Issue Number I.

1. The Fostoria Glass Company is a West Virginia corporation with its principal offices within the Northern Judicial District of the State of West Virginia.

2. Within the time prescribed by law it filed its income and excess profits tax returns for the fiscal years ending June 30, 1935, and 1937, including in said returns certain income as derived from realization upon certain stock of Diamond Alkali Company (Delaware). In each year disposition of preferred stock of Diamond was re-ported and gain computed on the basis of three hundred twenty dollars ($320.00) per share as the March 1, 1913, value of stock of Diamond Alkali Company (West Virginia), which stock increased by stock dividends, had been exchanged in 1928 for Series A and B Preferred and Common shares of Diamond of Delaware. Fostoria paid the tax due under each of said returns.

3. The Commissioner of Internal Revenue assessed an additional tax against Fostoria for each of said years based upon his finding that the fair market value of Diamond (West Virginia) as of March 1, 1913, was one hundred eight and 12/100 Dollars ($108.12) per share. The additional assessments were paid by Fostoria and claims for refund were duly and legally filed, based upon the assertion that the fair market value of Diamond (West Virginia) as of March 1, 1913, was three hundred twenty dollars ($320.00) per share. The income and excess profits taxes for the year 1937 and all additional assessments for the years 1935 and 1937, were paid to F. Roy Yoke, Collector of Internal Revenue for the Northern District of West Virginia.

4. Subsequently, Fostoria duly and legally filed additional claims for refund for each of said years, which claims for refund stated that the sums received from the disposition of Diamond Alkali stock and reported as realized gains, were in fact essentially equivalent to taxable dividends within the meaning of Section 115(g) of the applicable Revenue Acts 1934, 1936, 26 U.S.C.A. Int.Rev.Acts, pages 704, 870.

5. On March 1, 1913, Fostoria was the owner of two hundred fifty (250) shares of the stock of Diamond Alkali Company (West Virginia). Diamond Alkali commenced operations in July, 1912. The enterprise was extremely successful and the corporation paid cash dividends beginning with its first six months of operation and in addition, paid a stock dividend of one hundred per cent (100%) in 1916 and one of two hundred per cent (200%) in 1920. This resulted in Fostoria owning fifteen hundred (1500) shares of said stock on December 31, 1928, when Diamond (West Virginia) reorganized and a Delaware corporation was formed with an authorized capital of eighty thousand (80,000) shares of Series A Preferred, eighty thousand (80,000) shares of Series B Preferred, and one hundred twenty-five thousand (125,-000) shares of Common. Shares in Dia-

mond of West Virginia were exchanged for shares in Diamond of Delaware, each share of Diamond of West Virginia receiving one and one-fourth (1¼) shares of Common, one (1) share of Series A Preferred, and one (1) share of Series B Preferred.

6. In 1932, a twenty-five per cent (25%) dividend in common stock was declared and paid by Diamond. In December, 1934, it declared and paid a five hundred per cent (500%) dividend in common stock. In March, 1937, it declared a fifty per cent (50%) stock dividend in common stock. All of said stock dividends were capitalized out of earnings of the company, there being no contributions to the capital other than the original subscription.

7. Beginning in January of 1931, Diamond Alkali Company began the reacquisition of its Series A and Series B Preferred stock and on February 4, 1934, the corporation filed with the State of Delaware a certificate for retirement of forty-five thousand seven hundred thirteen (45,713) shares of Series A and twenty-one thousand four hundred twenty-six (21,426) shares of Series B, which stock had been acquired by the company and paid for out of current earnings. On July 14, 1933, the Diamond Alkali Company called for redemption ten thousand (10,000) shares of the remaining outstanding Series A Preferred and on January 31, 1934, it called for redemption twenty-five per cent (25%) of the remaining outstanding Series A Preferred. It also during 1933, acquired six thousand four hundred one (6,401) shares of the Series B Preferred. On March 21, 1934, it called for redemption fifty per cent (50%) of the remaining shares of Series A Preferred, said call being as of July 2, 1934. On July 6, 1934, Fostoria Glass Company turned into the transfer agent of Diamond Alkali Company for redemption five hundred sixty-three (563) shares of Series A Preferred stock and received therefor sixty-one thousand nine hundred thirty dollars ($61,-930.00).

8. As of April 1, 1935, Diamond Alkali Company called for redemption the remainder of the outstanding Series A Preferred stock and on April 3, 1935, Fostoria Glass Company delivered to the transfer agent of Diamond Alkali Company its remaining Series A Preferred stock aggregating five hundred sixty-two (562) shares and received therefor the sum of sixty-one thousand eight hundred twenty dollars ($61,820.00).

9. During the year 1935, Diamond Alkali Company acquired six thousand fifty-three (6,053) shares of the Series B Preferred stock and in 1936, it acquired twelve thousand six hundred nine (12,609) shares of said stock. On February 2, 1937, it called for redemption the remainder of Series B Preferred stock, said redemption date being April 1, 1937. The Fostoria Glass Company, in accordance with this call and at the request of Diamond Alkali Company, delivered to the transfer agent of the Diamond Alkali Company one thousand (1,000) shares of Series B Preferred stock and received therefor the sum of ninety-nine thousand nine hundred thirty dollars ($99,930.00). All of said stock so acquired was paid for out of current earnings and charged to treasury stock. The net profits of Diamond Alkali Company, after provision for income taxes for the period December 31, 1928, through December 31, 1937, were as follows:

| | |
|---|---|
| 1928 | $4,309,698.27 |
| 1929 | 5,096,402.95 |
| 1930 | 4,925,178.16 |
| 1931 | 1,354,750.04 |
| 1932 | 2,036,400.91 |
| 1933 | 3,005,922.30 |
| 1934 | 3,630,484.03 |
| 1935 | 3,659,440.13 |
| 1936 | 3,866,738.44 |
| 1937 | 4,010,659.28 |

In each year of its operation the corporation's earnings were largely in excess of dividend requirements upon the preferred and cash dividends upon the common stock were relatively small.

10. No sound business reason appears for the redemption of the preferred stocks. The Diamond Company was not engaged in a policy of retrenchment or liquidation, but on the other hand, expanded each year of its existence except for a normal decline during the depression year 1931. The Diamond Alkali Company was not engaged in a policy of reducing capital liability. During all the time that the preferred stock was being called for redemption, the common stock was being systematically increased so that the net effect was a large increase in capitalization of the company.

11. Cash on hand and in banks as of the period December 31, 1928, through December 31, 1937, was greatly in excess of the requirements of the company and in addition thereto, the company carried large investments in United States Government

Bonds, municipal and state bonds, and stocks and bonds of domestic corporations ranging in amounts from eleven million four hundred fourteen thousand ($11,414,-000.00) in 1928 to fourteen million sixty-six thousand dollars ($14,066,000.00) in 1937. The company's surplus was not invested in plant improvements. In 1937, after its program of redemption of preferred stock and expansion of common stock had been completed, its cash and investment account was in the amount of fourteen million sixty-six thousand five hundred seventy-two and 11/100 dollars ($14,066,572.11) and its surplus account was seven million ninety-six thousand five hundred sixty-four and 94/100 dollars ($7,096,564.94).

12. The capital stock of Diamond Alkali Company was closely held among corporations engaged in the glass and soap business, together with the officers of such companies. As of January 1, 1929, there were one hundred five (105) shareholders and despite the issuance of extremely large stock dividends, these one hundred five (105) shareholders, insofar as they survived as of December 31, 1937, retained a controlling interest in the company. The shareholders as of December 31, 1937, totaled two hundred ninety-five (295) individuals and corporations holding stock totaling twenty-one million two hundred fifty thousand six hundred eighty dollars ($21,-250,680.00).

Upon the foregoing findings of fact, the Court reaches the following conclusions of law:

A. The issuance by Diamond Alkali Company of Delaware of its Series A and Series B Preferred stocks and their subsequent acquisition, cancellation or redemption by that company, was essentially equivalent to the distribution of a taxable dividend under the provisions of Section 115(g) of the Revenue Acts respectively of the years 1934 and 1936.

B. Being such taxable dividend, the plaintiff is entitled to a dividend received credit upon the sums received from the redemption of eleven hundred twenty-five (1,125) shares of Series A Preferred stock during its fiscal year ending June 30, 1935, under the provisions of Section 23(p) of the Revenue Act of 1934. This credit, however, is limited insofar as this suit is concerned, to the amount paid F. Roy Yoke, Collector of Internal Revenue for the Collection District of West Virginia, and for which claim for refund was made on the 20th day of September, 1939, to-wit, the sum of two thousand four hundred forty-two and 77/100 dollars ($2,442.77) with legal interest thereon.

C. Being such taxable dividend the plaintiff is entitled to a dividend received credit of eighty-five per cent (85%) of the amounts received upon redemption of one thousand (1,000) shares of Series B Preferred stock during its fiscal year ended June 30, 1937, under the provisions of Section 26(b) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 836. Such credit results in an overpayment in income and excess profits taxes by the plaintiff for the year 1937 in the amounts of eleven thousand four hundred forty and 18/100 dollars ($11,440.18) and three thousand seven hundred fifty-seven and 80/100 Dollars ($3,-757.80) with legal interest thereon.

Findings of Fact and Conclusions of Law upon Issue Number II.
Status of Issue.

The Fostoria Glass Company purchased two hundred fifty (250) shares of Diamond Alkali stock, a West Virginia corporation, at one hundred dollars ($100.00) per share on or about March 5, 1910. Said Diamond Alkali Company reorganized as a Delaware corporation in 1928 and issued shares of Series A and Series B Preferred stock, certain shares of which were received by Fostoria Glass Company in exchange for Diamond Alkali (West Virginia) stock and disposed of by that company during the fiscal years ending June 30, 1935, and June 30, 1937, as hereinbefore set forth. It has been stipulated and agreed by the parties hereto that on March 1, 1913, the value per share of the capital stock of Diamond Alkali Company of West Virginia was greater than the cost of said stock to the plaintiff and that the March 1, 1913, value to be allocated to each share of the Series A Preferred stock of Diamond Alkali Company of Delaware is 6.0833% of the March 1, 1913, value of one share of the capital stock then outstanding of the Diamond Alkali Company of West Virginia and that the March 1, 1913, value to be allocated to each share of Series B Preferred stock of the Diamond Alkali Company of Delaware is 4.9766% of the March 1, 1913, value of one share of the capital stock then outstanding of the Diamond Alkali Company of West Virginia.

The issue of the value of the capital stock of Diamond Alkali Company, a West Virginia corporation, as of March 1, 1913,

was submitted to a jury and the jury found said stock as of March 1, 1913, to have the value of three hundred twenty dollars ($320.00) per share.

The defendant herein moved the Court to set aside said verdict of the jury and grant a new trial of said issue.

Upon the issues thereby presented, the Court doth hereby make the following findings of fact and reach the following conclusions of law:

1. The plaintiff, Fostoria Glass Company, did file its certain tax returns for the fiscal years 1935 and 1937, including therein gains based upon the disposition of preferred stock of Diamond Alkali Company (Delaware) computed upon the basis of three hundred twenty dollars ($320.00) per share as the March 1, 1913, value of the stock of Diamond Alkali Company (West Virginia) as set forth in Findings of Fact Number II of Issue Number I hereof.

2. The Commissioner of Internal Revenue did assess against Fostoria Glass Company for each of said years an additional tax based upon its finding that the fair market value of Diamond Alkali Company (West Virginia) as of March 1, 1913, was one hundred eight dollars and 12 cents ($108.12) per share. Fostoria Glass Company paid said additional assessments and did duly and legally file its claims for refund of such additional assessments as set forth in Findings of Fact Number 3 of Issue Number I herein. That upon the basis of a March 1, 1913, value of three hundred twenty dollars ($320.00) per share for the Diamond Alkali Company (West Virginia) stock so held by Fostoria Glass Company, the gain realized from the disposition of eleven hundred twenty-five (1,125) shares of Diamond Alkali Company (Delaware) Series A Preferred stock in 1935 by Fostoria Glass Company was one hundred one thousand eight hundred fifty dollars ($101,850.00) if such disposition constituted a sale thereof, while the gain realized by Fostoria Glass Company in 1937 upon such basis through the disposition of one thousand (1,000) shares of Series B Preferred stock of Diamond Alkali Company (Delaware) was eighty-four thousand four and $^{67}/_{100}$ Dollars ($84,004.67) if such disposition constituted a sale thereof.

Wherefore, upon the foregoing findings of fact, the Court reaches the following conclusions of law:

A. That there was no error in the trial before a jury herein of the issue of the March 1, 1913, value of the stock of Diamond Alkali Company, a Delaware corporation.

B. That the finding of the jury of three hundred twenty dollars ($320.00) per share as such value is fully justified by the evidence.

C. That the motion to set aside the verdict of the jury herein and grant a new trial of said issue is overruled.

D. That the plaintiff is entitled to recover from the defendant upon this issue the sum of six thousand two hundred and $^{57}/_{100}$ dollars ($6,200.57) represented by the claims of refund filed upon the 20th day of September, 1939, and the 28th day of September, 1940, together with legal interest thereon.

Inasmuch, however, as the Court has found under Issue Number I herein that the disposition of said preferred stock in Diamond Alkali Company (Delaware) by the Fostoria Glass Company was not a sale thereof, but that its redemption by Diamond Alkali Company (Delaware) was substantially equivalent to the distribution of a taxable dividend under the provisions of Section 115(g) of the Revenue Acts of 1934 and of 1936, judgment herein shall be taken by the plaintiff under Issue Number I hereof.

An order may go in accordance herewith.