## COMMISSIONER OF INTERNAL REVENUE v. SNITE (two cases).

### Nos. 9768, 9769.

United States Court of Appeals
Seventh Circuit.

Nov. 15, 1949.

820

Hon. Theron L. Caudle, Assistant Attorney General, Irving I. Axelrad, Assistant to Assistant Attorney General, U. S. Department of Justice, Ellis N. Slack, A. F. Prescott, Special Assistants to Attorney General, for petitioner.

John E. Shea, George E. McMurray, Jr., Washington, D. C., Joseph E. Newton, Chicago, Ill., for respondent.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

The Tax Court decided that the purchase price paid by a family corporation to two of its principal stockholders, husband and wife, for a portion of their stock sold to the company in 1942 and 1943, did not constitute a distribution essentially equivalent to a taxable dividend under Section 115(g) of the Internal Revenue Code, 26 U.S.C.A. § 115(g). Upon review, the commissioner makes no assault upon the findings of fact but urges that, upon their proper construction, the decision was erroneous.

The Local Loan Company, incorporated in Delaware, July 1, 1928, had, at the outset, a capital structure of 20,000 shares of common stock, increased in 1934 to 50,-000. No question of adequacy of the consideration paid by the taxpayers for their shares is presented. During 1935 they created two irrevocable trusts, known in the record as the "Funded Insurance" and the "Living" trusts. To the first named, the husband transferred insurance policies of the face amount of $675,000 and the wife, 3000 shares of stock. To the second, the husband transferred 3000 shares. The primary beneficiaries in each instance were the taxpayers' two children; the trustees, their daughter, her husband and Griffin, executive vice-president of the company. On December 22, 1941, the husband delivered 840 additional shares to the "Living" and the wife, 400 shares to the "Funded Insurance" trust.

Certain important employees of the company expressed their eagerness to acquire interests in the corporate enterprise. They proposed that the company purchase some of its own stock from the taxpayers, place it in the corporate treasury and then make it possible for the employees to buy it. This specific procedure was suggested because the employees feared that the death of Mr. Snite, prior to completion of purchase directly from him under options covering a future period, would frustrate their purpose, whereas an option on the part of the company to buy the shares from it would afford them full protection in case of Snite's death. The employees' urgent argument eventually prevailed over the persistent reluctance of Snite, who, finally, in 1942 agreed to the proposal. Under the arrangement as finally adopted, each taxpayer was to sell to the corporation 1000 of its shares held by him at $150 per share, which, in turn, the company was to make available to employees Griffin and Murphy at the same price. On December 17, 1942, the directors adopted a resolution providing for the purchase of 1000 shares from each taxpayer at $150, to be retained as treasury stock of the corporation and "to be used in such manner as the Board of Directors may hereafter determine." The stock was delivered on December 28, 1942, and, contemporaneously, each taxpayer received a corporate check for $150,-

000. Each share at that time was worth somewhat in excess of $150. The next year a similar resolution was adopted, under which the company purchased 360 shares from the husband and 1140 from the wife. Certain loans were made by husband and wife to the company, but their details and their discharge, we think, are unimportant. The company carried the shares acquired from the taxpayers as treasury stock. It was not cancelled but was held as an asset of the corporation.

Because of the Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 961 et seq., the executive orders promulgated thereunder and the regulations issued by the commissioner, salary increases were forbidden without government approval until the limitations were finally removed in August, 1945. During the war years the employees applied no further pressure for completion of the options, as accountants advised them that, inasmuch as the value was in excess of $150 a share, the excess might be held to constitute additional income under both the wage and revenue laws, and that the purchase of stock directly from the taxpayers at $150 per share might be considered a subterfuge to evade salary limitations and income taxes. The employees were convinced that the sale of the stock by the taxpayers to the company and placing it in the corporate treasury satisfied their immediate objective, and anticipated that the purchased stock would be made available for purchase by them after salary restrictions had been withdrawn by the government. Later, in August, 1946, the directors authorized issuance of options to purchase the shares at a price of $150 a share. Only a small part has as yet been transferred to the employees.

The company was prosperous; it was engaged in the small loan business, holding cash in each of the years in question of approximately one million dollars, and receivables, in excess of nine million dollars. It borrowed substantial amounts of money to invest in additional receivables and declared cash dividends out of liberal earnings from year to year. In view of an increase in receivables from $9,064,403 to $11,017,346 out of surplus and profits and plans to expand, a reduced dividend was declared in 1944.

Each taxpayer reported the sale of the stock. The undisputed cost basis was $28.725 and $28.7175 per share. They accounted for a net gain upon each sale, as a long term capital gain subject to tax. The commissioner, however, ruled that the entire proceeds of sale constituted ordinary income under Sections 22(a) and 115(g) of the code, 26 U.S.C.A. §§ 22(a), 115(g).

Upon review, the Tax Court held that the facts of record precluded any conclusion that the transactions had the essential effect of dividends and that, on the contrary, they were, as the taxpayers had reported them, sales of capital assets. The commissioner contends here that the court erred in failing to hold that the entire proceeds received by the taxpayers from the company in 1942 and 1943 in return for sale of a portion of their holdings in the company were ordinary income, rather than proceeds of sales of capital assets. He insists that, absent a liquidation motive, a redemption of stock out of earnings and profits is always a dividend, and that whether cash distributed has the effect of a taxable dividend is merely a question of whether the distribution comes out of earnings and profits.

Section 115(g) of the Internal Revenue Code is as follows: "If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend." Under this Act it is apparent that, in order to constitute a dividend taxable as ordinary income, stock must be cancelled or redeemed, the stockholder whose stock is cancelled or redeemed must receive a distribution from earnings and profits and the cancellation or redemption must be at such time and in such manner as to be essentially equivalent

to a taxable dividend. As we construe the commissioner's argument, he would have us eliminate the last statutory requirement, namely: at such time and in such manner as to be "essentially equivalent to the distribution of a taxable dividend," and hold that if the stock is redeemed and if the distribution is from earnings, it conclusively follows, as an inevitable net result, that the distribution is to be treated as a dividend taxable as ordinary income. We think this is a fallacious construction of the statute.

■ In the first place the fact, as found by the Tax Court, sustained by the evidence, was that there was no distribution essentially equivalent to a taxable dividend. That court found that the company purchased shares of stock from its own stockholders, paid cash therefor and placed the stock in the treasury. Obviously, the sale of stock to the company was the same as the sale of a piece of real estate to it and the same as the purchase from stockholders of stock in another corporation. It was, in its essence, a sale of an asset for a stated valuable consideration, resulting in a profit, for which the taxpayers duly accounted.

The commissioner relies upon Commissioner of Internal Revenue v. Estate of Bedford, 325 U. S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611, but we do not deem that case as in anywise controlling the question before us. There the query was whether cash distributed to the stockholders of a corporation on a recapitalization exchange was to be treated as a dividend or as a capital gain. All of the stockholders surrendered their stock and received new stock and a cash distribution. That decision was based on Section 112(c) (2), 26 U.S.C.A. § 112(c) (2), rather than Section 115(g) involved in this case. It clearly involved an exchange of stock surrendered for cancellation, issuance of new stock, and a distribution of cash pro rata to stockholders out of earnings and profits, whereas, in the instant case, there was no surrender of stock for which new stock and cash were issued but an out and out sale of stock which became an asset of the corporation. There was no pro rata distribution to stockholders but the payment of purchase price to two out of four stockholders, all of whom held substantial interests in the corporation. By virtue of the transaction, the holding of each of the two selling stockholders was lessened in amount and the proportionate holding of the other stockholders increased.

In this connection the commissioner cites also Kirschenbaum v. Commissioner, 2 Cir., 155 F.2d 23, 170 A.L.R. 1389, in which the court recognized that it had been in error in its former interpretation of Section 115 (g). But the court did not in that case pass upon the question before us. It refused to define the precise limitations under which proceeds of sale are taxable under Section 115(g) or those under which they are not taxable.

Bazley v. Commissioner, 331 U. S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782, 173 A.L.R. 905, likewise relied upon by the commissioner did not involve Section 115(g). It involved a section governing recapitalizations and reorganizations and held that the recapitalization in question was a paper recapitalization whereby the stockholder received pro rata distribution of debentures, equivalent in all respects to a distribution in the nature of a dividend.

■ The Tax Court disposed of these citations by the following remarks: "Respondent insists it is now established law that the net effect of the transaction, rather than the motives and purposes of the corporation or its stockholders, is the test of taxability. It must be recognized that the net effect rationale inheres in a number of decisions. See Bazley v. Commissioner, 331 U.S. 737 [67 S.Ct. 1489, 91 L.Ed. 1782, 173 A.L.R. 905]; Hirsch v. Commissioner [9 Cir.], 124 F.2d 24; Flanagan v. Helvering, [73 App.D.C. 46], 116 F.2d 937; Hyman v. Helvering [63 App. D.C. 221], 71 F.2d 342; cf. Commissioner [of Internal Revenue] v. Bedford's Estate, 325 U.S. 283 [65 S.Ct. 1157, 89 L.Ed. 1611]. But all that this means is that no one factor is controlling. It surely does not mean that the mere existence of sufficient earnings and profits to cover the acquisition of the stock automatically brings the transaction within the provisions of

Section 115(g). If that were so, it would seem that practically no room would be left for the operation of the provisions of Section 115(g) relating to distributions in partial liquidation. Just as the presence of a legitimate business purpose will not, standing alone, conclusively determine that Section 115(g) is inapplicable, so the mere fact that the corporation has sufficient surplus available does not conclusively determine that the section is applicable. All relevant factors must be considered in determining the net effect of the transaction." With this language we agree. As Judge Vinson, now Chief Justice, said in Flanagan v. Helvering, 73 App.D.C. 46, 116 F.2d 937, 939: "The phrases 'in such manner' and 'essentially equivalent' negative any idea that a weighted formula can resolve the one crucial issue—shall the distribution be treated as a taxable dividend." And the Treasury Regulations, 111, Sec. 29, 115-9, themselves provide that whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. It seems to us that the court below rightfully decided that, in determining whether the distribution made to the taxpayer was essentially of the character of a dividend, all the factors and all the circumstances should be considered and the net result determined therefrom.

The Tax Court did not discuss the question of whether in fact redemption had been made. We seriously doubt whether redemption ever occurred. There was an express sale of the assets to the corporation. The stock was not cancelled and we think it was not redeemed. Redemption in this section, we believe, connotes something other than repurchase; it includes the idea of a surrender of shares by a stockholder and a retirement of that which he surrenders. Alpers v. Commissioner, 2 Cir., 126 F.2d 58. These taxpayers did not surrender their stock but sold it. They did not contemplate retirement of their shares and the corporation did not retire them. Rather it placed them in its treasury, as live assets to be disposed of as it should thereafter determine. A true redemption of stock, preferred or common, occurs when it is called and retired. The stockholder, in such instance, receives the redemption money in discharge of his shares which are thereby thereafter without legal existence. On the other hand, when the corporation purchases its own capital stock it deals in the shares as it might have done in the stock of another corporation. Commissioner of Internal Revenue v. Rollins Burdick Hunter Co., 7 Cir., 174 F.2d 698.

The lack of force of the commissioner's reasoning is apparent, we think, when we consider the position of the taxpayers. They had acquired this stock for a certain cost. When they sold it, they accounted for their profit. If all they received is to be treated as ordinary income, what becomes of their original investment, their original cost of the stock sold to the corporation? This is a pertinent inquiry in determining not only whether there was a redemption but also in determining whether the money received by the taxpayer is to be treated as ordinary income.

The decision is affirmed.