Maclin P. **DAVIS** and Edith U. Davis

v.

**UNITED STATES of America.**

Civ. A. No. 4479.

United States District Court
M. D. Tennessee,
Nashville Division.

Sept. 15, 1967.

William Waller and Robert G. McCullough, Waller, Lansden, Dortch & Davis, Nashville, Tenn., for plaintiffs.

Gilbert Merritt, U. S. Atty., Nashville, Tenn., and H. Stennis Little, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

FRANK GRAY, Jr., District Judge

This civil action was instituted by Maclin P. Davis [1] (hereinafter the taxpayer) against the United States of America (hereinafter the government) for a refund of income taxes and interest paid in response to an assessment by the Internal Revenue Service. The controversy arises out of a redemption at par of certain shares of preferred stock owned by taxpayer which the Internal Revenue Service treated as a dividend distribution to which § 301 of the Internal Revenue Code applies. Taxpayer maintains that this distribution constituted a redemption "not essentially equivalent to a dividend" within the meaning of § 302(b) (1) and thus qualifies as a distribution "in exchange for the stock" under § 302(a). The cause is now before the court on the motions of both parties for summary judgment.

## I

In April, 1945, taxpayer and E. B. Bradley organized the Tennessee Foundry and Machine Company (hereinafter the corporation) for the purpose of manufacturing steel castings. Prior to incorporation, taxpayer had entered into negotiations with the Reconstruction Finance Corporation (hereinafter the RFC) and the First American National Bank of Nashville, Tennessee, for the purpose of obtaining a $95,000 loan to the corporation. The prospective lenders agreed to make the loan if certain terms and conditions were met. The main prerequisite was that the incorporators provide the corporation with an additional $25,000 working capital either by making a loan evidenced by a subordinated deferred note or by purchasing preferred or additional common stock.

Bradley, who had received 50 percent of the common stock in exchange for property transferred to the corporation, was unable or unwilling to invest additional capital but insisted on retaining 50 percent of the voting power. Consequently, the only methods of raising this additional capital considered by taxpayer were purchasing preferred stock or taking subordinated debentures in exchange for a loan. Taxpayer decided the former was preferable, giving as his reason that this would be more desirable than an outright loan from a balance sheet standpoint. Taxpayer contends that the sole purpose of this transaction was to enable the corporation to obtain the RFC loan, and that all concerned were in agreement that this stock would be held only until the loan was repaid at which time it would be redeemed.

Upon approval of the loan application by the RFC, taxpayer purchased 1,000

---

1. Edith U. Davis, taxpayer's wife, is a party to the suit because a joint return was filed.

shares of 6 percent preferred stock at par value of $25 per share as authorized by the charter of the corporation. Thus, as of the date of incorporation or shortly thereafter, the outstanding shares were held as follows:

| Shareholder | Common – % | Preferred – % |
| --- | --- | --- |
| E. B. Bradley | 500 – 50 | . |
| Maclin P. Davis | 250 – 25 | 1,000 – 100 |
| Edith U. Davis | 250 – 25 | |

Due to financial difficulties encountered by the corporation, the loan was refinanced in 1946. The principal was increased to $110,000 and the maturity date was extended.

In 1952, taxpayer purchased the 500 shares of common stock owned by Bradley and in 1959 he transferred 250 of these shares to his son, M. P. Davis, Jr., and 250 shares to his daughter, Edith D. Whiteman. Consequently, at the time of the redemption in question the ownership of the outstanding shares of the corporation was as follows:

| Shareholder | Common – % | Preferred – % |
| --- | --- | --- |
| Maclin P. Davis | 250 – 25 | 1,000 – 100 |
| Edith U. Davis | 250 – 25 | |
| M. P. Davis, Jr. | 250 – 25 | |
| Edith D. Whiteman | 250 – 25 | |

The original loan agreement provided that, as long as any part of the loan was outstanding, no dividends could be paid without first obtaining the prior written consent of the Bank and the RFC. In 1960, permission was granted to declare dividends on the outstanding stock. Consequently, semi-annual dividends in the amount of $750 were paid on the preferred stock beginning on October 5, 1960.

On September 23, 1963, after final payment on the loan had been made,[2] the board of directors of the corporation resolved to redeem the preferred stock by accepting taxpayer's offer to transfer these shares in exchange for the sum of $25,000. On October 1, 1963, taxpayer surrendered the certificate representing the stock and was paid $25,000.

Taxpayer, characterizing the distribution as a return of capital, did not report this amount as income in his 1963 return on the theory that no gain had been realized because his basis in the preferred stock was equal to the amount received. After an audit, the Internal Revenue Service concluded that the amount received pursuant to the redemption constituted a distribution of property within the meaning of § 301 and thus was essentially equivalent to a dividend and taxable as ordinary income. Upon the Commissioner's denial of a claim for a refund, this action was commenced.

## II

The general rule of § 301 is that a distribution by a corporation to a shareholder with respect to his stock is treated as a dividend to the extent of the corporation's earnings and is includable in the recipient's gross income, unless the distribution can be brought within an exception to this rule. The relevant exception here is found in the provisions of § 302 dealing with distributions in redemption of stock.

2. Final payment was made June 1, 1963.

Under § 302(a), corporate redemptions are to be treated as distributions in part or full payment for the stock redeemed if the transaction comes within one of the four subdivisions of § 302(b). Section 302(b) (1) provides that a redemption which "is not essentially equivalent to a dividend" falls within the protective scope of § 302(a). Thus, if a redemption qualifies under § 302(b) (1), the distribution is treated as a payment in exchange for stock under § 302(a) with the result that it is not includable in gross income as a dividend and any amount realized on the redemption is entitled to capital gains treatment.

The determinative issue, therefore, is whether the amount received by taxpayer pursuant to the redemption in question is "essentially equivalent to a dividend" and thus taxable as ordinary income.

### III

However, before the basic issue of dividend equivalency can be decided, the preliminary question of the bearing of the § 318(a) family attribution rules upon § 302(b) (1) must be resolved.

The government contends that the attribution rules are automatically applicable on the ground that § 302(c) (1) specifically provides that § 318(a) "shall apply in determining the ownership of stock for purposes of this section." If the attribution rules are applicable, taxpayer must be regarded as the constructive owner of all of the outstanding stock of the corporation and the redemption must be characterized as basically pro rata.

Taxpayer, in assuming a contrary position, reasons that the language of § 318 (a), which provides that it is applicable only to "those provisions of this subchapter to which the [attribution] rules * * * are expressly made applicable," precludes applicability to § 302(b) (1)

because § 318(a) is relevant to § 302(b) only for the purpose of determining stock ownership and § 302(b) (1), unlike the other subdivisions of § 302(b), does not expressly refer to stock ownership, but rather speaks in terms of the effect of the redemption. Thus, it is argued that the "non-fact" of constructive ownership is not properly a part of the factual inquiry into the effect of the distribution required by § 302(b) (1).

Taxpayer further asserts that the legislative history of § 302(b) (1) also precludes automatic applicability of the attribution rules. In support of this contention, taxpayer argues that § 302(b) (1) was intended to incorporate existing law as to whether a redemption is essentially equivalent to a dividend[3] and that under § 115(g) of the 1939 Code the ownership of the remaining stock was only one element in a primarily factual determination.

Although taxpayer's contentions are not without some persuasiveness,[4] the court is of the opinion that the weight of authority supports the government's position that the attribution rules apply under § 302(b) (1). See, e. g., Commissioner of Internal Revenue v. Berenbaum, 369 F.2d 337 (10th Cir. 1966); Levin v. Commissioner, 47 T.C. 258 (1966); Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, 292 (2d ed. 1966). For the purpose of determining dividend equivalency, therefore, ownership of all of the outstanding common stock of the corporation is attributable to the taxpayer with the effect that the distribution was essentially pro rata. Consequently, corporate ownership cannot be regarded as affected in any substantial way by the transaction.

However, dividend equivalency does not necessarily follow from the court's

---

3. Sen.Rep. No. 1622, 83d Cong. 2d Sess. 44, U.S.Code Congressional and Administrative News, p. 4870 (1954): "In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a

sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon a factual inquiry."

4. Cf. Lewis v. Commissioner, 47 T.C. 129 (1966).

conclusion that the attribution rules are applicable under § 302(b) (1).

## IV

While the words "not essentially equivalent to a dividend" are not further defined by Congress, it is clear that the intent of Congress in enacting § 302(b) (1) was that the "test for determining whether a redemption was 'essentially equivalent to a dividend' should be the same as the test utilized in interpreting and applying the same words in § 115 (g) (1) of the 1939 Code." Kerr v. Commissioner of Internal Revenue, 326 F.2d 225, 230 (9th Cir. 1964). Some attention, therefore, must be given to the tests developed under the 1939 Code in order to ascertain present standards of administering § 302(b) (1).

Prior to Flanagan v. Helvering, 73 App.D.C. 46, 116 F.2d 937 (1940), it was generally held that the applicability of § 115(g) to a stock redemption was a factual question in which the basic criterion was whether the transaction was motivated by a legitimate corporate business purpose as distinguished from mere tax avoidance.[5] However, in *Flanagan,* at 939–940, the court took the position that "the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation, is the fundamental question in administering § 115(g)." Under this objective test, business purpose as the basic criterion for the applicability of § 115(g) was replaced by an analysis of the net effect of the redemption transaction. However, many of the courts which purported to follow the net effect test, in effect, expanded that test to include inquiry into the possibility of an underlying legitimate business motive. See, e. g., Boyle v. Commissioner of Internal Revenue, 187 F.2d 557 (3rd Cir. 1951), cert. denied 342 U.S. 817, 72 S.Ct. 31, 96 L.Ed. 618; Commissioner of Internal Revenue v. Snite, 177 F.2d 819 (7th Cir. 1949); Hirsch v. Commissioner of Internal Revenue, 124 F.2d 24 (9th Cir. 1941).

In Keefe v. Cote, 213 F.2d 651 (1st Cir. 1954), the court had the alternative of following the net effect test as set forth in *Flanagan,* supra, or as broadened by subsequent cases which inquired into the motive underlying the transaction. The taxpayer, who owned in excess of 90 percent of the stock of a closely held corporation, had been issued the redeemed stock in exchange for a note previously given him in settlement of salaries due. When the stock was subsequently redeemed at an amount representing its appreciated value, the taxpayer argued that the increment was entitled to capital gains treatment. The court upheld this contention, holding that the redemption was a step in carrying out a legitimate corporate purpose.[6]

In the opinion of the court, Keefe v. Cote, supra, is to be read as reviving the "proposition that if there is a legitimate corporate purpose for the acquisition of stock by the issuing corporation it [the redemption] is not essentially equivalent to the distribution of a taxable dividend." United States v. Fewell, 255 F.2d 496, 500 (5th Cir. 1958).

■ Thus, while the net effect of the distribution is generally regarded as the most important consideration in deter-

---

**5.** This test is generally met when a corporation has effected a preconceived legal plan to improve the corporation's standing as opposed to a plan which primarily benefits the stockholders.

**6.** Although taxpayer owned 93.9 percent of the stock and the distribution was therefore essentially pro rata, the court did not regard the fact that the objective result of the transaction was essentially equivalent to a dividend as determinative. Rather, the court focused on the taxpayer's testimony that the stock had been issued to him for the purpose of improving the corporate credit standing and with the understanding that the stock would be redeemed whenever it was convenient for the corporation to do so. The court concluded that dividend equivalency was lacking on the grounds that the redemption was a part of the original transaction and that the improvement of the corporation's credit standing was a legitimate corporate business purpose.

mining dividend equivalency, there are two positions within this rule which, for purposes of convenience, may be described as the "strict" and the "flexible" net effect tests. Under the former, the ultimate result of the distribution is evaluated without regard to any underlying business purpose, while, under the latter, motivation may be properly considered in ascertaining the ultimate effect.

Upon consideration, the court is of the opinion that the "flexible" net effect test is the preferable method of ascertaining § 302(b) (1) dividend equivalency. Considering the possibility of a justifying business purpose as a factor in this determination more clearly recognizes that the outcome will generally depend "upon the facts and circumstances of each case." Federal Income Tax Regulations, § 1.302–2(b). The question before the court, therefore, is whether there is a legitimate business purpose underlying this distribution which is sufficiently compelling to overcome the objective fact that its pro rata nature "points to a tax avoidance scheme." Ballenger v. United States, 301 F.2d 192, 199–200 (4th Cir. 1962).

■ While recognizing that there was a legitimate business purpose underlying the issuance of the preferred stock in 1945, the government maintains that there was no comparable justification for the redemption in 1963. This assertion is not well taken. In determining whether the instant case satisfies the "flexible" net effect test, it is not essential that the issuance and the redemption must have been motivated by distinct business purposes. Rather, it is sufficient if it can be found that "there was a corporate [business] purpose in issuing the shares, and * * * that they were redeemed in carrying out that corporate purpose." Keefe v. Cote, supra, 213 F.2d at 657.

■■ It is clear that the preferred stock was issued solely in order to provide the additional security required by the RFC as a precondition to making the initial $95,000 loan. Based on the

facts as set forth in the record, the court is of the opinion that it was understood that the corporation would subsequently redeem these shares when the RFC loan was repaid and that the redemption in 1963 was the final step in carrying out the original purpose of obtaining this loan. Of course, at the time the preferred stock was issued and its redemption planned, such redemption would not have been pro rata. The subsequent acquisition of Bradley's stock holdings by taxpayer, making the redemption distribution essentially pro rata because of the § 318(a) attribution rules, neither impairs the legitimacy of the purpose underlying the issuance of the preferred stock nor alters the fact that the redemption was simply the final step taken in completion of this purpose.

Accordingly, the court holds that the amount received by taxpayer in exchange for his 1,000 shares of preferred stock was not essentially equivalent to a dividend within the meaning of § 302(b) (1) of the Code and must, therefore, be treated as a distribution in part or full payment for the stock redeemed, under § 302(a).

An appropriate order will be submitted within twenty (20) days.