# Pacific Vegetable Oil Corporation, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 50344.   Filed April 5, 1956.

*Dudley F. Miller, Esq.*, for the petitioner.
*Edward H. Boyle, Esq.*, for the respondent.

4

8

12

14

OPINION.

HARRON, *Judge:*

*Issue 1.*

The petitioner keeps its books and reports its income on an accrual method of accounting. Prior to 1949, with respect to income from sales of copra under a standard copra sales contract, petitioner accrued the entire invoice amount of such contracts in the year of the contract and it did so with respect to its year-end contracts where copra was in transit and the landed weights thereof had not been determined prior to the end of the taxable year. The problem under this issue relates to contracts executed in the latter part of 1949 which we refer to as year-end contracts for convenience. The petitioner adopted a new system in 1949 of including in gross income only 95 per cent of the invoice amount of its year-end contracts. The petitioner takes the position that 95 per cent of invoice prices was paid before the end of 1949 on the sight drafts accompanying the bills of lading which were mailed to the banks of buyers and paid by the buyers before December 31, 1949. This appears to be the purport of an exhibit attached to the stipulation of facts. The petitioner contends that the new system adopted in 1949 is consistent with its accrual method of accounting, that it more clearly reflects annual income, that it corrects a previous error in its accrual method, and that the new system does not constitute a change in its accrual accounting

method for which permission of the Commissioner was required under Regulations 111, section 29.41-2.[1] The petitioner contends that only 95 per cent of invoice price under its copra sales contracts accrued in the taxable year, with respect to its year-end contracts under which landed weights had not been determined prior to December 31, and that the remaining 5 per cent of invoice prices did not accrue in 1949. On the point of what constitutes accrued income, petitioner cites L. O. 1086, I-1 C. B. 87; *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417; *Permanent Homes Land Co.*, 27 B. T. A. 147; *Helvering* v. *Russian Finance & Construction Corporation*, 77 F. 2d 324. Petitioner relies on *Corn Exchange Bank* v. *United States*, 37 F. 2d 34; and *Great Northern Railway Co.*, 8 B. T. A. 225.

The respondent has determined that the entire invoice amounts of the copra sales contracts which are involved under this issue are includible in gross income for 1949. His determination resulted in adding to income $159,256.16. The respondent determined that the accounting system used by petitioner prior to 1949, as it applied to copra shipments in transit under year-end contracts, properly reflected petitioner's income. He contends that the new system adopted by petitioner in 1949 represents a change in accounting method and that since petitioner did not request or obtain permission for a change in accounting method it was error for petitioner to omit 5 per cent of invoice prices, $159,256.16, from 1949 income. Respondent also determined that petitioner's liabilities to make allowances to buyers for loss in weight of copra while in transit were, as of December 31, contingent liabilities not definitely incurred or accrued in the taxable year, and, therefore, not deductible until such liabilities were definitely ascertained. Respondent contends, also, that the full amount of the invoice prices of copra in transit accrued before December 31, 1949. Respondent cites the following cases: *Ross B. Hammond. Inc.*, 36 B. T. A. 497, affd. 97 F. 2d 54; *Estate of L. W. Mallory*, 44 B. T. A. 249; *Berryman D. Fincannon*, 2 T. C. 216, 220; *Kahuku Plantation Co.* v. *Commissioner*, 132 F. 2d 671, affirming 43 B. T. A. 784; *Brown* v. *Helvering*, 291 U. S. 193; *Crescent Cotton Co.*, 5 B. T. A. 850; and *David J. Joseph Co.* v. *Commissioner*, 136 F. 2d 410.

Petitioner admittedly did not request or obtain permission to make a change in its method of accounting for income from copra sales con-

---

[1] Regulations 111.

SEC. 29-41-2. BASES OF COMPUTATION AND CHANGES IN ACCOUNTING METHODS.—* * *
* * * * * * *
A taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. For the purposes of this section, a change in the method of accounting employed in keeping books means any change in the accounting treatment of items of income or deductions, such as a change from cash receipts and disbursements method to the accrual method, or vice versa; * * *

tracts covering copra in transit. Regulations 111, section 29.41–2, and prior regulations to the same effect, have the purpose of promoting consistent accounting practice from year to year, thereby securing uniformity in the collection of the revenues. The regulation is reasonable and valid and compliance with it has been held to be mandatory. *Ross B. Hammond, Inc.* v. *Commissioner, supra; Estate of L. W. Mallory, supra; St. Paul Union Depot Co.* v. *Commissioner,* 123 F. 2d 235; *Berryman D. Fincannon, supra; Elmwood Corporation* v. *United States,* 107 F. 2d 111. The Commissioner determined that petitioner, in the taxable year 1949, changed its method of accounting with respect to sales of copra in transit and the income therefrom. That determination is presumptively correct and the petitioner has the burden of proving it is erroneous. *St. Paul Union Depot Co.* v. *Commissioner, supra,* p. 240; *Welch* v. *Helvering,* 290 U. S. 111.

One question under this issue is whether the petitioner in 1949 changed its method of accounting and basis for reporting income from sales where the shipment was in transit. As has been stated above, petitioner argues that its new system did not represent a change in accounting method. The petitioner has the burden of proving that it did not change its accounting method. The evidence under this issue consists chiefly of stipulated facts and two exhibits (1A, the sales contract form, and 2B, a schedule about invoice amounts, adjusted charges, and additional payments by buyers or refunds by petitioner). There is very little testimony. It is well to mention, preliminarily, a few matters about petitioner's evidence. Petitioner uses the term "shipped weights" rather loosely. That term means, as we understand, the quantity specified in a sales contract, such as 550 tons, or some other specified quantity; it does not mean extra tons which may be shipped by petitioner in an overweighting procedure for market advantage. When a shipment is overweighted at the place of shipment, the invoice amount is computed upon the weight specified in a contract, nevertheless. Another point which is not entirely clear is whether under the new system adopted in 1949, petitioner regarded as "accrued" before the end of the year, only the 95 per cent of invoice price payments represented by payment or acceptance before the end of the year of sight drafts for such amounts, or whether petitioner regarded such 95 per cent as "accrued" before the end of the year on the basis of an executed contract and shipment of copra regardless of whether a sight draft had been paid or accepted before the end of the year. Since petitioner has not made any point of these details, they do not affect our conclusions but we have observed that accuracy about them is to be desired, and petitioner's lack of accuracy, if material, serves only to indicate some inadequacies in petitioner's proof.

Prior to 1949, petitioner accrued in income of a taxable year the entire amount of invoice prices computed under sales contracts which had been executed in a taxable year and under which contracts shipment had been made. The contract specified a certain number of tons and the price per ton. The invoice price was the result of multiplying the specified number of tons by the specified price per ton. Also, prior to 1949, petitioner treated as an "expense" of a sale, in the year landed weight was determined for a shipment, the amount of the adjustment in the charge to the buyer. Such amount was the dollar value of the difference between the tons specified in the sales contract (shipped weight) and the tons determined upon a reweighing of the shipment at the end of transit (landed weight). Such "expense" was deducted in a year following the year for which invoice price was accrued, if the landed weight was determined after the end of the year of shipment under the sales contract. Also, prior to 1949, under the accounting method followed by petitioner, no "Reserve for Outturn Settlements" was carried on petitioner's books. We conclude that the new system adopted in 1949 constituted a change in petitioner's method of accounting. We are not satisfied that petitioner has shown that the new system did not represent a change in accounting method. We understand that under the new system, petitioner accrues as income in a taxable year, only the amounts which are paid by a buyer, rather than the amounts computed under the sales contract, i. e., the invoice price. That is to say, petitioner includes in income, first, 95 per cent of the invoice price, and in a later year, it includes any additional payments of the buyer made after landed weights are determined. Also, under this system petitioner will not treat as an expense, and deduct, the difference between invoice price and the adjusted price based on outturn weights. In our opinion, the accruing of 95 per cent, rather than 100 per cent, of invoice price, the setting up of a so-called reserve of 5 per cent for future adjustments, to be made after the close of a taxable year, and the abandonment of the method of taking as expense deductions the amount of adjustments in invoice price made after the taxable year, constitute a change in accounting method. Cf. *Brown* v. *Helvering*, *supra*.

The effect of the Commissioner's determination is to require that petitioner continue to use the accounting method consistently employed by petitioner in prior years. The Commissioner has determined that the method consistently followed before 1949 clearly and accurately reflected income. Secs. 41 and 42, I. R. C. 1939. The Commissioner's determination is within the broad administrative discretion accorded to him under the statute. See *Brown* v. *Helvering*, *supra*, where it was said, that, "It is not the province of the court to weigh and determine

the relative merits of systems of accounting." The Commissioner's determination that petitioner shall continue to use the accounting method consistently followed unless his permission to change is given, is not to be disturbed unless an abuse of his wide administrative discretion is evident. *Schram* v. *United States*, 118 F. 2d 541; *Shoong Inv. Co.* v. *Anglim*, 45 F. Supp. 711. We are unable to find that there has been an abuse of discretion as the following observations may serve to demonstrate.

The petitioner does not deny that upon the execution in 1949 of the copra sales contracts involved under this issue, contracts were formed in which a quantity of goods was specified, the price per ton was specified, the initial 95 per cent payment was based upon such quantity and price, otherwise known as the invoice price, and that the petitioner's right to receive payment of such price was fixed during 1949. Also, the petitioner takes the position that the 95 per cent of invoice price payments were received before the end of 1949. The petitioner does not deny that, accordingly, title to the shipments passed to the buyers upon their payment of sight drafts in the amount of 95 per cent and their receipt of bills of lading to which the sight drafts were attached, or that petitioner made technical delivery of the shipments to the buyers before the end of 1949 upon the payment of and acceptance by the buyers of the sight drafts. See 2 Williston, Sales (rev. ed.), sec. 289 and sec. 305. We think it is clear, that under the contracts in question, namely the year-end contracts where copra was in transit, the year 1949 was the year in which petitioner's *right* to receive payment for such sales became fixed, and that the amount of the payment was determined, as well. For example, if the shipment were lost at sea, the invoice price thereof was the amount petitioner had a right to recover, other things being equal. It is the *right* to receive income, not the actual receipt thereof that determines when it should be accrued and included in gross income. *United States* v. *Harmon*, 205 F. 2d 919; *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281; *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290; *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. Although adjustment might be made in the amount of the invoice price after determination of landed weight, this was, we believe, only part of and due to the seller's warranty, specific or implied, that it would deliver the quantity called for by the sales contract, and that if the quantity unloaded at the end of transit should be less, according to outturn weight, the buyer would not be charged for more goods than he received. As was stated in *David J. Joseph Co.* v. *Commissioner, supra,* page 411—

In practically every contract of sale for merchandise there is an implied warranty of quality and quantity of the merchandise sold, for the breach of which the merchant would be liable to the buyer, but the breach would not develop prior to delivery, and the right to demand damages or a refund would not accrue until its discovery. * * *

The amounts of future adjustments in the invoice prices were contingent and liability for them did not accrue in the taxable year 1949. *Crescent Cotton Co., supra.* That they were contingent, not fixed, and not susceptible of an accurate estimate in 1949 is amply shown by the evidence before us. In one instance, upon adjustment in 1950 of the invoice price after determination of landed weight, the adjusted price was only $96.59 less than the invoice price; in another instance, it was $20,901.78 less than the invoice price; in two instances, the invoice price was less than the adjusted, landed-weight price; in one instance there was no adjustment in invoice price when landed weight was determined. However that may be, the contingency of having to make adjustments in invoice prices does not prevent the accrual of income in the year in which the right to income under the sales contracts became fixed. *Brown* v. *Helvering, supra.*

The petitioner has failed to show that the Commissioner has abused his administrative discretion in making the determination which has given rise to this issue. Furthermore, the petitioner has not produced evidence to show that in the copra selling business it is customary to accrue in the year sales contracts are made under which the shipment is in transit, only 95 per cent of the invoice price rather than 100 per cent. Cf. *Pacific Grape Products Co.* v. *Commissioner,* 219 F. 2d 862, reversing 17 T. C. 1097.

We think also that petitioner's action in effecting a new system of accounting for income from copra sales contracts where shipments were in transit, whereby it changed the manner of treating items of income and expense cannot be denominated as merely a technical correction of prior errors, or a mere change in "accounting practice," as petitioner chooses to call it. This was a substantial change which may have had some adverse effect upon the revenues, and, therefore, it clearly required the Commissioner's prior consent to the change. *Curtis R. Andrews,* 23 T. C. 1026.

The authorities cited by the petitioner have been considered. They are either inapplicable or distinguishable on their facts.

There are other points which, if discussed, would demonstrate further the errors in petitioner's general contentions. One, for example, is that the Internal Revenue Code makes specific provision for certain reserves, such as reserves for bad debts, and provides how such specific reserves may be treated for tax purposes. With these exceptions, the rule is that reserves may be deducted only in the year when they represent liabilities which have been incurred. *Brown* v. *Helvering, supra.* The reason underlying the rule is that a liability does not accrue while it remains contingent. It is clear that any liability of petitioner to reduce the contract-invoice price was, at the end of 1949, contingent. The record shows that petitioner sometimes overweighted shipments (without any change in the contract-invoice price) so as

to make up for shrinkage and loss of weight in transit. When that was done, landed weights would equal or be close to the contract-invoice weight and price and, then, no or little adjustment downward of the contract-invoice price would be required. The evidence does not establish that the contract-invoice price was an inflated amount. Of course, if petitioner underweighted a shipment, shipping fewer tons than the contract specified, an adjustment downward of the contract-invoice price would be necessary when the consignee took possession of and reweighed the shipment. The record indicates that petitioner sometimes underweighted shipments when it believed that practice was advantageous because of the trend of the market prices of copra. But this practice was within petitioner's control. Also, it provides a possible explanation of why at times landed weights of shipments were more than normally less than the weights shipped per contracts.

In view of the conclusions we have reached, it is not necessary to discuss other aspects of the issue even though consideration has been given to them.

The Commissioner's determination is sustained. *Berryman D. Fincannon, supra; Advertisers Exchange, Inc.*, 25 T. C. 1086.

*Issue 2.*

In 1949, Western Vegetable Oils Company, Inc., had only one class of issued and outstanding stock, namely, common stock, and petitioner, 1 of 10 stockholders, owned 2,094 shares out of 5,182 shares, or 40.4 per cent of the stock. In October 1949, Western acquired, canceled, and retired 1,346 shares of the stock held by petitioner for which it paid $220 per share, or $296,120. It is agreed that, if material, petitioner's basis for the stock so acquired was $18,832, or about $13.99 per share. Since petitioner received $296,120, the long-term capital gain would be $277,288, if respondent's determination is correct.

Petitioner treated Western's distribution of $296,120 as dividends and took a dividend credit of 85 per cent under section 26 (b) of the 1939 Code, in the amount of $251,702, whereby $44,418 of the alleged dividend remained subject to tax.

The Commissioner's determination results in the elimination of $296,120 from dividend income of the petitioner and, correspondingly, elimination of a credit against dividend income of $251,702; and the inclusion of $277,288 in petitioner's net long-term capital gain. Petitioner did not have any net short-term capital loss in 1949 to offset against net long-term capital gain.

The petitioner contends that the distribution by Western in exchange for its stock was at such time and in such manner as to make the distribution and cancellation of the stock "essentially equivalent

to the distribution of a taxable dividend" within the provisions of section 115 (g) (1) of the 1939 Code. The Commissioner maintains that the entire amount of the distribution must be treated as in payment for the stock under section 115 (c), and that none of the distribution was essentially equivalent to a taxable dividend. Respondent relies upon Regulations 111, section 25.115-9, the material part of which is as follows:

The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend. * * *

It is concluded that petitioner has failed to prove that the distribution to petitioner by Western in 1949 of $296,120 in exchange for 1,346 shares of Western's stock was at such time and in such manner as to make the distribution, and the cancellation and redemption of the stock, essentially equivalent to the distribution of a taxable dividend within the intendment of section 115 (g).

The facts show that after petitioner surrendered 1,346 shares of Western's stock, petitioner's relationship to Western was essentially changed. For example, after Western acquired, in April or May 1949, 140 shares of its stock from the estate of Denroche, petitioner's block of Western's stock, 2,094 shares, represented 41.5 per cent of the outstanding stock, 5,042 shares. After petitioner surrendered 1,346 shares, it retained 748, and, also, there remained 3,696 shares of Western's stock outstanding. Accordingly, petitioner's remaining 748 shares represented 20.1 per cent of Western's outstanding stock.

The distribution to petitioner was a distribution by Western "in complete cancellation or redemption of a part of its stock." Western canceled and retired the stock. Furthermore, the distribution to petitioner was one of a series by Western in complete cancellation and redemption of part of its stock. In 1949, Western received and accepted offers from six stockholders, in addition to petitioner, to surrender all of their stock which amounted to 686 shares. All of these transactions were bona fide, arm's-length transactions in which the surrendered stock was retired. Including the 1,346 shares which petitioner surrendered, 2,032 shares were canceled and retired by Western. In addition, Western retired 978 shares which it had acquired before 1949 and had held as treasury stock. There were, therefore, a series of distributions by Western in complete cancellation and retire-

ment of stock, all of which stock constituted a portion of the outstanding stock. These distributions, of which the distribution to petitioner was one, come within the definition of partial liquidation set forth in section 115 (i). It has been stated that in order to be "a partial liquidation it is not necessary that the corporation be planning a cessation of business or be in the process of final liquidation," or that all of the outstanding stock be retired at once. *Benjamin R. Britt*, 40 B. T. A. 790, 796, 797, affd. 114 F. 2d 10; *Commissioner* v. *Quackenbos*, 78 F. 2d 156; *Commissioner* v. *Cordingley*, 78 F. 2d 118; *Salt Lake Hardware Co.*, 27 B. T. A. 482. Section 115 (i) "applies, not to a distribution in liquidation of the corporation or its *business*, but to a distribution in cancellation or redemption of a part of its *stock*," *Hamilton Allport*, 4 T. C. 401, 403. The mere existence of sufficient earnings and profits to cover the acquisition of the stock does not automatically bring the transaction within the provisions of section 115 (g). *Fred B. Snite*, 10 T. C. 523, 531, affd. 177 F. 2d 819.

We recognize that the net effect of the transaction is to be considered, *Flanagan* v. *Helvering*, 116 F. 2d 937, in determining whether section 115 (g) applies. In applying the "net effect" rule, we have observed that no one factor is controlling, *Fred B. Snite, supra,* and that all relevant factors must be considered in determining the net effect of the transactions. We have considered all of the factors which the evidence discloses. For example, Western had declared and paid dividends in each year, including 1949, since 1943. Also, the distribution which petitioner received upon the surrender of 1,346 shares of Western's stock, was not one of a pro rata distribution to *all* of Western's then existing stockholders. A. A. Schumann, Western's president, did not receive any such or comparable distribution. We are unable to find that the distribution received by petitioner was in any sense a substitute for regular dividends which otherwise would have been payable.

We note that the evidence submitted by petitioner is lacking in explanation for Western's series of distribution in retirement of stock. There is no testimony relating to these transactions.

Upon the record before us, it is our opinion that the various factors which are before us for consideration lead to the conclusion that the transaction in question whereby petitioner surrendered 1,346 shares of Western's stock, did not have the equivalence of a taxable dividend under section 115 (g). It is held that the distribution in question was a distribution in partial liquidation within the meaning of section 115 (i), and that it is taxable under the provisions of section 115 (c). The respondent's determination is sustained.

*Decision will be entered for the respondent.*